STATE of Missouri, Respondent,

v.

James W. HICKS, Appellant.

No. 52783.

Supreme Court of Missouri,
Division No. 1.

March 10, 1969.

**216**

Norman H. Anderson, Atty. Gen., Jefferson City, Austin B. Speers, Sp. Asst. Atty. Gen., Kansas City, for respondent.

John T. Sluggett, III, Clayton, for appellant.

STORCKMAN, Judge.

This is an appeal from a conviction of murder in the second degree and a sentence of ten years in the custody of the Department of Corrections. Sections 559.-020 and 559.030, RSMo 1959, V.A.M.S. The defendant was found guilty by a jury which also assessed the punishment. The defendant was represented at the trial by counsel of his own choosing. The same counsel represents him on appeal. The contentions made on appeal in general are that the trial court erred in refusing to sustain the defendant's motion for a judgment of acquittal or in not granting him a new trial on the ground that the verdict

was against the weight of the credible evidence; that the court erred in refusing to admit evidence of the victim's police record; and that the court erred in entering judgment immediately after verdict and prior to the filing of defendant's motion for a new trial and a ruling thereon, and in not granting the defendant a proper allocution.

The defendant admitted that he shot and killed one Thomas W. Muncher on August 17, 1966, but defended on the ground that the act was committed in self-defense and that the homicide was justifiable pursuant to the provisions of § 559.040(2), RSMo 1959. The evidence is not greatly conflicting.

The defendant lived in Sunset Hills, St. Louis County, Missouri. He worked as a boilermaker for General Steel Industries in Granite City, Illinois, and had been so employed for sixteen and one-half years. He had never been in trouble before other than for traffic violations. The defendant's hours of employment were from 11 p. m. to 7 a. m. In addition to his regular employment, the defendant owned and operated an automotive steam cleaning business on the premises of a service station at the northeast corner of Sarah and McPherson Avenues in the City of St. Louis. This neighborhood was described by witnesses as having a high incidence of crime, such as robberies, assaults, stabbings, shootings and other crimes of violence, and being frequented by alcoholics, known police characters, addicts, prostitutes and panderers.

The defendant's first encounter with Thomas Muncher was on August 15, two days before the shooting. The defendant had engaged a Mr. Lovett to deliver an air-conditioner to an address on Natural Bridge and had agreed to pay Lovett $5 for his services. Difficulties with the installation were encountered and the defendant went to the location in response to a call from Lovett. Thomas Muncher was there with Lovett but there was no trouble between the parties at that time. The air-

conditioner did not operate and it was removed and apparently remained in Lovett's possession.

On the following day, August 16, the defendant received a call at his home from Ralph Bunche who was then operating the service station where the defendant conducted the business of steam cleaning automobile engines. Mr. Bunche told the defendant that a man was waiting for his money for moving the air-conditioner. The defendant went to the service station but instead of finding Lovett, as he expected, Muncher was waiting for him. Muncher was a big man, about 6 foot 6 inches in height and weighing about 240 pounds. He was a muscular man and known in the neighborhood as "Slim" and "Treetop".

When the defendant saw Muncher at the service station on August 16, Muncher was drinking heavily from a bottle of wine. Muncher first attempted to borrow a dollar from the defendant, and when this was refused he demanded that the defendant pay him $5 for the delivery and installation of the air-conditioner. The defendant refused to do so saying his agreement was with Lovett and he would settle with him. Muncher then became very belligerent and threatening. He grabbed the defendant by his wrists and told the defendant he could snap the defendant's wrist "like a peppermint stick". The defendant was able to get away from Muncher and went to a telephone on the premises and called the police. Muncher came at him again as he was finishing the call. Muncher attempted several times to strike the defendant who avoided the blows by ducking away and running out of the door of the station. Muncher ran after him, chased the defendant through the gas pumps, around a parked truck, and east on McPherson for about three-quarters of a block where a police patrol car came by and Muncher was arrested. During the chase Muncher was threatening the defendant in violent terms.

The next morning the defendant cleaned and fired the gun subsequently used in the shooting and put it in his pocket. He did not know what the police had done with Muncher. During the morning of August 17, Muncher was released from jail and returned to the neighborhood; he made two separate purchases of wine at a liquor store at the corner. He returned to the service station and sat on a step or walkway about 30 inches wide and 11 inches high along the front of the filling station with Sam Sykes and Alvin Cole, two other men of the neighborhood. Muncher was drinking wine and declared he was waiting for the defendant.

While Muncher and his companions were seated in front of the service station, the defendant Hicks was on another portion of the premises demonstrating how to steam clean an automobile motor. About noon the defendant and Glenn Murray passed in front of the place where Muncher and his companions were seated; they were going to defendant's automobile on the other side of the parking lot. As he walked by, the defendant said nothing to Muncher and did not look in his direction. When the defendant had reached the automobile, Muncher called him back. The defendant returned and stood in front of where Muncher was seated. Muncher demanded that the defendant pay him $5. The defendant said he wasn't going to pay him anything, that his business was with Mr. Lovett. There was general agreement by the state's witnesses that Muncher told the defendant among other things that someone was going to pay him and that he was going to get the $5 from the defendant "or a part of his ass".

One of the witnesses testified that Muncher made no move to get up; another testified that Muncher was waving his hands and arms while he talked and started to rise; another testified that Muncher put one arm back as if he was going to arise. The defendant testified that Muncher was coming up about two paces away when the defendant took the gun from his rear pocket and shot him. Only one shot was fired although there were additional shells

in the gun. Muncher was shot in the left chest and was dead on arrival at a hospital. The defendant called the police and when they arrived he gave them his gun and admitted the shooting. The defendant was taken to headquarters where in the presence and acting on advice of counsel he made a complete statement as to what had happened.

The defendant Hicks testified that he was aware of Muncher's reputation for turbulence and violence, that he was afraid of Muncher and wanted to keep away from him, and that he did not intend to kill Muncher. The defendant also testified that he wore glasses, that he could not see without them, and if they were knocked off he could not even see to run.

■ The defendant contends that the trial court erred in refusing to sustain his motion for judgment of acquittal at the close of all the evidence. He also asserts that the trial court erred in not granting a new trial on the ground that the verdict was clearly against the weight of the evidence. These related points will be treated together. In testing the sufficiency of the evidence on the defendant's motion for judgment of acquittal, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the state, and evidence and inferences to the contrary must be rejected. State v. Hughey, Mo., 404 S.W.2d 725, 729 [3]; State v. Papin, Mo., 386 S.W.2d 355, 359 [7].

■ Section 559.040(2) provides, inter alia, that a homicide shall be deemed justifiable when it is committed in lawful defense of the person "when there shall be reasonable cause to apprehend a design * * * to do some great personal injury, and there shall be reasonable cause to apprehend immediate danger of such design being accomplished". All of the evidence including that of the state tends to prove that the defendant had reasonable cause to apprehend that Muncher had a design, that is, a purpose or intention to inflict some

great personal injury on the defendant. No other interpretation could be put on the undisputed events of the day before. Muncher physically assaulted the defendant on the premises where the defendant conducted his business and where he had a right to be. See 40 C.J.S. Homicide § 130 a and c, p. 1015. While the defendant's physical makeup is not specified, it is clear from the record that he was no match for Muncher who was described as a "giant" of a man. After the defendant escaped from the first assault, Muncher attacked again and the defendant avoided him only by running from the premises and down the street until Muncher was intercepted by the police patrol. The defendant's apprehension and recognition of his physical inability to protect himself and his desire to avoid Muncher are indicated by his conduct on the following day. He paid no attention to Muncher until Muncher called him to account.

■ The remaining question is whether the defendant at the time he shot Muncher had reasonable cause "to apprehend immediate danger" of Muncher inflicting "some great personal injury" upon him. The defendant relies heavily upon State v. Rash, 359 Mo. 215, 221 S.W.2d 124, wherein the defendant Rash killed Bryan Mullinax, his brother-in-law, who lived with the defendant and his wife. Mullinax had been drinking and when intoxicated was quarrelsome. Mullinax came home in such condition late at night and told the defendant he did not like the way things were going and that he was going to leave but before he did so he was going to beat the defendant's head in. Mullinax who was bigger and stronger attacked the defendant and they fell to the floor; the defendant landed on his back and Mullinax was on top choking him. The defendant Rash managed to get his knife and stab his assailant until his hold relaxed. This court held that all of the evidence, including the state's, went to prove that the defendant acted in self-defense and that no

crime had been committed. The conviction was reversed and the defendant discharged. In State v. Bartlett, 170 Mo. 658, 71 S.W. 148, also cited by defendant, this court held a person may resist a public whipping, and if his physical inferiority to the assailant prevents effective resistance such person may use a weapon to defend himself. In that case the person was actually under attack and had retreated to his office. The conviction was reversed. State v. McGee, 361 Mo. 309, 234 S.W.2d 587, 591 [6], recognizes the rule that the law of self-defense implies the right of attack when it reasonably appears necessary for protection against an impending assault, but it depends on necessity, real or apparent, and the danger must be imminent or reasonably appear to be so.

■ As previously stated, the only material difference in the testimony of the witnesses was with regard to what Muncher was doing or about to do when he was shot. There was persuasive evidence that the defendant was in imminent danger of a harmful attack from Muncher. A jury might very well have found that the defendant was acting solely in self-defense, but we cannot so declare as a matter of law. The issue was one of fact for the jury and the trial court did not err in overruling defendant's motion for a judgment of acquittal. State v. Cook, Mo., 428 S.W.2d 728, 732 [1]; State v. Vincent, Mo., 321 S.W.2d 439, 442 [6]; State v. Huett, 340 Mo. 934, 104 S.W.2d 252, 261 [11]; State v. Farrell, 320 Mo. 319, 6 S.W.2d 857, 859 [6].

■ Likewise, the contention that the circuit court should have granted a new trial because the verdict is against the weight of the evidence is of no avail here. Whether the verdict in a criminal case is against the weight of the evidence is a matter addressed solely to the trial court and is not reviewable on appeal. State v. Small, Mo., 423 S.W.2d 750, 751 [3]; State v. Thomas, Mo., 393 S.W.2d 533, 538 [13].

■ The defendant and others testified that Muncher was known to have a reputation for turbulence and violence. The defendant offered in evidence exhibits A, D, D–1 and D–2, which were records of the St. Louis Police Department showing that Muncher had been arrested approximately 47 times. The offer was refused. There is some authority for the proposition that in a case where self-defense is an issue evidence of specific acts of violence on the part of the person killed made known to the defendant is admissible on the question of whether the defendant could reasonably be apprehensive of danger to his life or of great bodily harm. See Wharton's Criminal Evidence, 12th Ed., Vol. 1, § 228, pp. 475–477. However, the general rule recognized in Missouri is that the reputation or character of the person killed for turbulence and violence cannot be established by proof of specific acts of violence on his part against persons other than the defendant. 40 Am.Jur.2d, Homicide § 306, p. 574; State v. Smart, Mo., 328 S.W.2d 569, 575 [10]; State v. Cavener, 356 Mo. 602, 202 S.W.2d 869, 874 [6]; State v. Naylor, 328 Mo. 335, 40 S.W.2d 1079, 1084–1085 [17]; State v. Goode, 271 Mo. 43, 195 S. W. 1006, 1007 [3]; Annotations: Admissibility of Evidence for Turbulence on Question of Self-Defense, 1 A.L.R.3d 571 and 64 A.L.R. 1029.

■ We are somewhat handicapped by the fact that the Police Department has refused to deposit these records for inspection by this court although the parties had stipulated in the transcript that this would be done. However, from their description in the record, we have concluded that defendant's exhibits A and D, to the extent that they tended to prove that Muncher had assaulted the defendant on August 16, 1966, or any other date, were admissible, and it was error to exclude them. Such specific acts of violence would be within the exception to the general rule stated above. Evidence of specific acts of violence between Muncher and persons other

than the defendant was properly excluded under the Missouri rule.

The defendant cites cases which hold that where a defendant claims self-defense he is entitled to an instruction to the effect that, if the jury believes from the evidence that the person killed was of a turbulent and violent disposition and that the defendant had knowledge thereof, it is a circumstance for the consideration of the jury in considering whether there was reasonable cause for defendant's apprehension of great personal injury to himself. In State v. Blair, Mo., 305 S.W.2d 435, 436 [3], and State v. Parker, 358 Mo. 262, 214 S.W.2d 25, 27 [4], the refusal to give such an instruction when offered was held to be reversible error. It has been held, however, that the failure to so instruct the jury does not constitute error when an instruction is not tendered even though one is requested. State v. Smart, Mo., 328 S.W.2d 569, 575 [9]. No such instruction was tendered in this case.

Two of the cards from the police records included pictures of Muncher. These exhibits, D–1 and D–2, were offered in evidence to show the physical attributes of Muncher and especially his facial characteristics. Objection was made on the ground there was some writing on the cards. There had been some attempt by the defendant to show by oral evidence that Muncher's appearance was fierce and awesome. A picture could portray the man's true appearance better than words, and apparently no other pictures were available. Any writing on the cards could have been adequately concealed while the jury was looking at the pictures. The court erred in not receiving the pictures in evidence and not permitting the jury to view them under proper safeguards.

The prejudicial effect of these errors is intensified by the obvious hostility exhibited during the trial by the court towards defendant's counsel in the presence of the jury. The court's attitude was not without provocation but its prejudicial effect was no less real. The difficulty began during the cross-examination of Samuel Sykes, a state's witness. Defendant's counsel detected the odor of alcohol and under questioning the witness admitted that he had been drinking before he took the stand. When counsel tried unsuccessfully to get the witness to look at him, counsel exclaimed: "You won't look me in the eye, because you are lying." State's counsel objected and the court ruled: "Sustained. I think you should apologize to the jury." Defendant's counsel apologized to the jury, the court, and counsel. At the conclusion of the cross-examination, defendant's counsel said to the witness: "That's enough. I had enough of you." An objection was sustained and the remark was stricken. At the end of redirect-examination, the court indicated to the witness that his examination was concluded and when the defendant's counsel undertook further examination the court stated, "You said you were finished. I took you at your word." There was further bickering before the recross-examination was begun during which defendant's counsel accused the court of making "derogatory comments". While the defendant's counsel was cross-examining a police officer concerning the number and kind of law violators in a certain district, the court injected a comment that the entire area should not be painted that way. When the police officer asked what counsel meant by the word "awesome", the court overruled an objection and remarked to defendant's counsel, "The officer asked you a pretty good question." Later on he called on defendant's counsel to sit down, for what reason is not disclosed.

In the defendant's case, while defendant's counsel was examining a witness, the court without an objection being made stated, "What is the purpose of this? We are going on a Cook's tour." Later on defendant's counsel asked the court to indulge him for a moment while records were being examined and the court commented, "All

right, gentlemen. Let's step on it." [1] Later when an objection was made, defendant's counsel twice asked permission to approach the bench; both requests were denied. After Muncher's arrest cards had been identified, there was a further wrangle between the court and defendant's counsel covering five pages of the record, and the court refused to permit a complete offer of proof to be made until after both sides had closed and the jury had been temporarily excused. During this exchange, defendant's counsel stated that the court's remarks were prejudicial and asked for a mistrial which was refused. In connection with granting defendant's counsel the time he had requested for oral argument, the court told him, "You can have forty. The jury is gone. Why don't you go, Mr. Sluggett, then we will be even."

The Code of Judicial Ethics, S.Ct. Rule 1.15, V.A.M.R., provides, inter alia, that: "Conversation between the judge and counsel in court is often necessary, but the judge should be studious to avoid controversies which are apt to obscure the merits of the dispute between litigants and lead to its unjust disposition. In addressing counsel, litigants, or witnesses, he should avoid a controversial manner or tone." The intemperate remarks of defendant's counsel during the cross-examination of the witness Sykes were improper and not in keeping with the admonition of S.Ct. Rule 4.18 to treat adverse witnesses "with fairness and due consideration". Any suitable comment he had to make on the credibility of the witness should have been reversed for his argument to the jury. Had the estimable trial judge not been afflicted with the illness and infirmity which resulted in his death some ten months later, he doubtless would have effectively handled the objectionable matters in some other manner and would have avoided the extended controversy in the presence of the jury which could not help but obscure the merits of the litigation and which may have contributed to an unjust result. Apparently the defendant's personal behavior at the trial was perfectly proper and free from criticism. Nevertheless, it appears that he has been deprived of a fair and impartial trial by reason of the unwarranted controversy between his counsel and the court. State v. Montgomery, 363 Mo. 459, 251 S.W.2d 654, 657 [3]; State v. Bunton, 312 Mo. 655, 280 S.W. 1040, 1042-1043 [3-5]. The adverse effect of the errors noted were doubtlessly augmented in this atmosphere of tension.

As soon as the jury's verdict was returned and received, the court asked the defendant if there was any legal reason why sentence should not be pronounced. The defendant's counsel asked for a presentence investigation which was denied, and the court immediately required the defendant to stand and sentenced him in accordance with the verdict contrary to S.Ct. Rule 27.20(a). Thereafter, a motion for a new trial was timely filed and overruled. The appeal was taken the same day the new trial was denied. The judgment of conviction which appears in the record is dated the same day the jury's verdict was returned. No further sentencing is shown by the transcript. The defendant also complains in this connection that he was not granted proper allocution in accordance with S.Ct. Rule 27.09. The procedure employed was erroneous; if that were all, it might be correctable by the procedure ordered in State v. Grant, Mo., 380 S.W.2d 799, 804 [10]. However, we need not consider whether the Grant case is applicable because we have concluded under all the circumstances that a new trial should be granted.

Accordingly the judgment is reversed and the cause is remanded for a new trial.

All of the Judges concur.

---

1. The trial was not a long one considering the seriousness of the offense involved; nor does it appear to have been unduly protracted. It began on December 5 and was argued and concluded on the morning of December 7, 1966.