James W. **CHAMBERS**, Appellant,

v.

Bill **ARMONTROUT**, Appellee.

No. 88–2383.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 19, 1990.

Decided July 5, 1990.

Thomas R. Schlesinger, Clayton, Mo., for appellant.

Jared Richard Cone, Jefferson City, Mo., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON and HEANEY, Senior Circuit Judges and McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges.

HEANEY, Senior Circuit Judge.

James Chambers appeals his state conviction and sentence of death for the capital murder of Jerry Lee Oestricker. We reverse the conviction because Chambers received ineffective assistance of counsel when his counsel (1) failed to interview, (2) failed to call at trial, and (3) failed to call at sentencing the only witness who would have testified that Chambers acted in self-defense.

## I. BACKGROUND

In December 1982, Chambers was tried for the murder of Oestricker in the Circuit Court of Jefferson County, Missouri. At that trial, two eyewitnesses gave conflicting versions of the events surrounding the moment when Chambers shot and killed Oestricker outside a bar in Arnold, Missouri.

Fred Ieppert, the government's eyewitness, testified to the following: (1) Chambers and Oestricker engaged in a heated argument inside the bar; (2) both Chambers and Oestricker decided to take the argument outside; and (3) upon their exit, Ieppert moved from his chair to the door of the bar, taking a few seconds to do so. Ieppert testified that he could observe the following from the door: (1) Oestricker stood up with his hands in the air; (2) Chambers pointed a pistol at Oestricker and fired a single shot into Oestricker's chest; (3) Chambers pistol-whipped Oestricker several times after he fell to the ground; and (4) Chambers told the victim to "take that, tough guy," shouted an epithet into the bar, and ran away.

James Jones, the other eyewitness, had left the bar several minutes before the shooting but had to wait in his car in the bar's parking lot because his engine was flooded. He testified that he observed the following: (1) the smaller man (Chambers) left the bar first, walked about half the length of a truck, and stood facing the bar; (2) the bigger man (Oestricker) left the bar a moment later; (3) the two men argued; (4) Oestricker moved towards Chambers and struck Chambers in the face, knocking Chambers to the ground; (5) Chambers then stood up and shot Oestricker, who was standing six feet away; (6) Oestricker fell back against the wall; (7) Chambers hit the victim with the gun several times, knocking the victim to the ground; (8) Chambers yelled into the bar, "Do any of you want any of this?" and to the victim, "Lay there and die"; (9) Chambers ran nearby to a parked car that had its engine running; and (10) the car sped quickly away. In addition, Jones testified that Oestricker was six foot-one inch tall and

weighed 240 pounds and that Chambers was five foot-nine inches tall and weighed 150 pounds. Jones was the only eye-witness to the events occuring just before the shooting.

Chambers' attorney requested that a self-defense instruction be submitted to the jury. The trial court refused. The jury found Chambers guilty of capital murder and sentenced him to death.

On appeal, the Missouri Supreme Court reversed the conviction. *State v. Chambers*, 671 S.W.2d 781 (Mo.1984) (en banc) [*Chambers I*]. It held that there was sufficient evidence to justify an instruction on self-defense, pointing specifically to Jones' testimony that Oestricker struck Chambers in the face, knocking Chambers to the ground. *Id.* at 783. The court held that a jury could reasonably conclude that Oestricker was the initial aggressor and that Chambers shot Oestricker because Chambers feared great bodily harm. *Id.*[1]

Missouri retried Chambers in Jefferson County. His newly appointed counsel was Donald W. Hager, a public defender. Hager neither interviewed Jones nor called Jones to testify on behalf of Chambers. The state did not call Jones. With this exception, the second trial proceeded in much the same manner as the first with Fred Ieppert providing the bulk of the prosecution's case. At the conclusion of evidence, Hager requested a self-defense instruction. As with the earlier trial, the trial court refused to instruct the jury on self-defense and denied Chambers the right to argue self-defense in his closing argument. The second trial also resulted in a conviction for capital murder. At sentencing, Hager sat mute, waiving Chambers' right to present mitigating evidence and argue for leniency. The jury sentenced Chambers to death.

With the assistance of yet another attorney, Chambers again appealed to the Missouri Supreme Court. Over the strong dissent of two judges, the court affirmed the conviction and the death sentence. *State v. Chambers*, 714 S.W.2d 527 (Mo.1986) (en banc) [*Chambers. II*].

On November 12, 1986, Chambers filed a motion in the Circuit Court of Jefferson County under Missouri Rule 27.26 asserting that he received ineffective assistance of counsel at the second trial. A hearing on this motion was held on February 3, 1987. Several witnesses testified, including Jones. Jones testified to the same version of events as he had at the first trial.[2] Jones also testified that neither Hager nor

---

1. The Missouri Supreme Court stated:

   Although there was verbal exchange inside the tavern, the initial act of physical aggression occurred when Oestricker struck Chambers in the face. Consequently, a jury could reasonably conclude that Oestricker, not Chambers, was the initial aggressor.

   Chambers is small in stature—5′6″ tall and weighing 150 pounds. Oestricker, on the other hand, was 6′4″ and 250 pounds. Something more than fear of size, however, is required to justify the use of deadly force in self-defense. Some affirmative action, gesture or communication by the person feared indicating the immediacy of the danger, the ability to avoid it and the necessity of using deadly force must also be present. *State v. Jackson*, [522 S.W.2d 317, 319 (Mo.App. 1975)]; *State v. Isom*, 660 S.W.2d 739 (Mo. App.1983). In *State v. Hicks*, [438 S.W.2d 215 (Mo.1969)], the victim was not only much larger than the defendant but was also the initial aggressor. This Court found that these factors created an appearance of necessity for defendant to use deadly force to protect himself against severe bodily harm. Certainly,

   appellant could have drawn the same conclusion here.

   *Chambers I,* 671 S.W.2d at 783.

2. Jones did attempt, however, to eliminate some apparent confusion created by his testimony at the first trial.

   Q: [Thomas Schlesinger, Chambers' counsel]: Please read from the first seven lines on Page 741 [of the transcript of the first trial]. A: [James Jones]: "No. It was right here, putting it behind his body, kind of against his leg. Q. Was Oestricker between him and the door? A. Yeah. Q. So was the gun back here? Is that right? A. Yeah."

   Q: Okay. Now it says here—or you just read that you testified it was kind of against his leg. Did you mean that it was hidden?
   A: No. I didn't mean that it was hidden.
   Q: Is the testimony that you gave here accurate?
   A: I would say. I could show anybody—I could show you where it was. You could make your own judgment on it. I would say its being hidden, my own personal opinion. *Chambers v. Missouri,* No. CV186–4580–CC–J3, transcript at 67 (Mo.23d Cir. Feb. 23, 1987).

anyone else from the public defenders' office had contacted him since the first trial.

Hager also testified at the Rule 27.26 hearing. He testified that before the second trial he had read Jones' testimony from the first trial, but that neither he nor anyone else from the public defenders' office ever contacted Jones.[3] Hager testified that he considered much of Jones' testimony to be damaging. The damaging aspects, according to Hager, were that Chambers stepped outside first, stopped, turned, and waited for Oestricker, concealing a pistol against his leg; Chambers pistol-whipped Oestricker and shouted, "Lay there and die;" Oestricker was six feet away and not moving towards Chambers at the time of the shooting; and Chambers left the scene in a car that was facing the road with its engine running. On this basis, Hager testified that he did not interview Jones or call Jones at the second trial because he believed that the damaging aspects of Jones' testimony outweighed its mitigating value.

Chambers' Rule 27.26 motion was denied by the Circuit Court of Jefferson County. His appeal of that ruling was denied by the Missouri Court of Appeals, and his application for transfer to the Missouri Supreme Court was denied.

Chambers next filed a petition for a writ of habeas corpus in federal court. Chambers alleged, *inter alia*, that he was denied effective assistance of counsel at the second trial because Hager failed to interview Jones or to call him at that trial. The district court held that Hager's performance was constitutionally adequate. The court concluded that the decision not to interview or call Jones at trial was reasonable because of the potential damaging aspects of Jones' testimony, because Jones was not a credible witness, and because Chambers signed a pretrial statement in which he agreed with Hager's decision not to call Jones at trial. Accordingly, the district court denied Chambers' petition for habeas relief.

Chambers appealed the district court's decision to this Court. On appeal, he argues that he was denied effective assistance of counsel because Hager did not interview Jones and did not call Jones at trial. A panel of this Circuit agreed, reversing the district court. *Chambers v. Armontrout*, 885 F.2d 1318 (8th Cir.1989). We granted the petition for rehearing en banc and vacated the panel decision. After rehearing the appeal en banc, we reaffirm the panel decision and reverse the district court's denial of habeas relief.

## II. DISCUSSION

Under the standards for analyzing a claim of ineffective assistance of counsel enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Chambers must show that Hager's performance was deficient and that it prejudiced Chambers' defense. *See id.* at 687, 104 S.Ct. at 2064. Counsel's performance is deficient when it is less competent than the assistance that should be provided by a reasonable attorney under the same circumstances. *Id.*

### A. FAILURE TO INTERVIEW JONES

The decision to interview a potential witness is not a decision related to trial strategy. Rather, it is a decision related to adequate preparation for trial. Thus, Hager had "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. at 2066. Because Jones was never interviewed by Hager, the question before us is whether Hager's decision not to interview Jones was reasonable from counsel's perspective at the time that decision was made.

The facts of this case, confirmed by Hager's actions at trial and testimony at the Rule 27.26 hearing, indicate that there was only one defense upon which Chambers could rely: self-defense. That defense was the only realistic defense to the capital

---

**3.** Hager did testify that an investigator from the public defenders' office contacted Jones' attorney. Nothing came of this conversation, and Hager's office did not make any attempt to follow up on this contact.

murder charge. Moreover, self-defense was a mitigating circumstance appropriate for the jury's consideration in determining whether Chambers should be sentenced to death. Thus, without Jones' testimony that Oestricker had knocked Hager to the ground, Hager was not permitted to argue self-defense as either a partial or complete defense to capital murder. Without Jones' testimony, the jury could only return a verdict that Chambers was guilty of capital murder.

Because of the grave effect of Hager's decision not to interview Jones in this capital murder case, Chambers alleges that Hager's decision was unreasonable. He asserts that an interview with Jones would have (1) clarified many of the problems Hager saw in Jones' testimony at the first trial, (2) permitted Hager to make his own assessment of Jones' demeanor and credibility, (3) permitted Hager to ascertain whether Jones would adhere to his testimony at the first trial, see supra note 2, (4) enabled Hager to discover additional evidence favorable to Chambers, and (5) enabled Hager to be more effective in his cross-examination of witnesses put forward by the government.[4]

To determine the reasonableness of Hager's decision not to interview Jones, a review of the underlying circumstances as known to Hager at the time of second trial is in order. Chambers never contended that he did not shoot Oestricker. Chambers never contended that he and Oestrick-er did not argue with each other in the bar. Chambers never contended that he and Oestricker did not challenge each other to a fight.

Chambers did contend at both trials that the government's theory that the fight was a ruse to lure Oestricker outside where Chambers could murder him was fiction and not fact. He contended that the shooting grew out of a barroom altercation and that he acted in self-defense after he had been knocked to the ground by Oestricker. Because Chambers' apparent strategy did not change from the first trial to the second trial and because no indication of new or different testimony existed, reasonable counsel would have anticipated that Chambers' second trial would proceed much as the first did. Except for the lack of testimony tending to show that Oestricker knocked Chambers to the ground just before Chambers shot him, the second trial did proceed much as the first did. The second trial therefore lacked the very testimony that the Missouri Supreme Court stated justified a self-defense instruction in the first trial.

Missouri argues, however, that Hager's decision not to interview Jones was reasonable in light of the damaging aspects of Jones' testimony. We disagree. Other witnesses had testified to the negative aspects of Jones' testimony cited by Hager as justifying his decision not to interview Jones.[5] In that respect, any damaging tes-

---

4. Although the State does not suggest that Jones was unavailable, Chambers notes that Hager had at his disposal the address and phone number of Jones and a paid investigator who was available to locate, interview, and subpoena Jones.

5. The State notes that Jones testified in the first trial that Chambers left the bar first and waited for Oestricker. Numerous witnesses testified to this fact at both trials. Second, Jones' testimony at the first trial could be read to imply that Chambers, as he left the bar, intentionally hid his pistol from Oestricker's view. A state witness testified to the same fact at both trials. *Missouri v. Chambers*, No. 64709, Transcript at 505–07 [*Chambers I*, T.] (testimony of James Fowler, a bar patron); *see Missouri v. Chambers*, No. 67191, Transcript at 586–88 [*Chambers II*, T.]; *see also Chambers I*, T. at 466 (testimony of Fred Ieppert and several other witnesses that

Chambers was hiding some knife or weapon). An interview with Jones would have clarified that he never intended to give such an impression. *See supra* note 2. Third, Jones testified that Chambers pistol-whipped Oestricker. Several of the State's witnesses also testified that Chambers pistol-whipped Oestricker. *Chambers I*, T. at 465, 508, 556, 645, 654, 689; *see Chambers II*, T. at 374–77, 420, 458, 501, 524, 540–41, 590. Fourth, Jones testified that at the time he was shot, Oestricker was standing six feet away from Chambers. Fred Ieppert testified to the same fact. *Chambers I*, T. at 464; *see Chambers II*, T. at 447 (Fred Ieppert testified that the distance separating the two was five feet). Fifth, Hager indicated that he considered Jones' testimony that Chambers shouted several epithets at Oestricker and the other bar patrons after the shooting to be damaging. Numerous witnesses repeatedly testified to this fact.

timony that Jones gave at the first trial was cumulative, and reasonable counsel would have interviewed Jones to make sure that Jones was willing to repeat his earlier testimony that Oestricker knocked Chambers to the ground, to satisfy himself as to the remainder of Jones' testimony, and to assess Jones' credibility.

The State also argues that Hager's decision not to interview Jones was reasonable because Hager had reasonably determined that Jones lacked credibility. We do not agree: (1) the Missouri Supreme Court based its decision in *Chambers I* to remand for a new trial on Jones' testimony; (2) the government made no attempt to impeach Jones' credibility at the first trial; (3) Hager never met Jones nor spoke with him on the telephone enabling Hager to form a personal impression of Jones; and (4) the transcript of Jones' testimony at the first trial discloses no basis upon which reasonable counsel would have concluded that Jones was not a credible witness.[6]

The State argues that further investigation of Jones was unnecessary because Chambers did not intend to use the theory of self-defense at trial. This argument is not supported by the facts of the case. Hager's defense of Chambers proceeded on a self-defense theory. His questions on cross-examination were focused solely on the issue of self-defense. Hager requested and was denied a self-defense instruction.

The trial court also did not permit Hager to argue self-defense to the jury. Most importantly, the self-defense theory, as either a total or partial defense to capital murder or a mitigating circumstance at the sentencing phase, was Chambers' only possible, indeed, his only reasonable, defense to the death penalty. *See also Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir.1986) (failure to investigate sole defense established ineffectiveness) and cases cited therein.

The State's final contention is that Chambers gave Hager reason to believe that further investigation of Jones would be fruitless or even harmful.[7] In support of this contention, the State relies on language in *Strickland.*

*Strickland,* however, is inapposite. The Supreme Court in *Strickland* stated that

[c]ounsel's actions are usually based quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a de-

---

*Chambers I,* T. at 466, 509, 542, 566, 680, 700; *see Chambers II,* T. at 330, 360, 375, 420–21, 508, 591. The final aspect that Hager considered damaging related to Jones' testimony that after the shooting, Chambers ran to a waiting car with its motor running which immediately sped off.

The dissent asserts that the "most damning evidence of cool planning was Jones' testimony that the car was left running." This may indeed be the case, but another witness, Dennis Simmons, testified that Chambers had a car "waiting." *Chambers I,* T. at 656–57; *see Chambers II* at 460–61. This evidence of premeditation therefore was before the jury, but without Jones' further testimony that Oestricker, a much larger man, knocked Chambers to the ground before the shooting occurred—evidence which was essential to the self-defense theory and tended to show that the shooting may not have been premeditated was not presented to the jury.

6. Assuming that Hager's determination that Jones lacked credibility was reasonable, we doubt that that determination, under these facts, would justify reasonable counsel's decision not to interview the only witness who had the only evidence supporting an essential element of the defendant's only defense.

7. The State's argument is that Hager's decision not to interview Jones is reasonable for the very reason that Chambers agreed with the decision in a signed statement. Chambers' signed statement is as follows:

I agree that Mr. Hager need not subpoena or call James Jones at my trial. His cross examination at the first trial was extremely damaging to me and I believe it would be at the second trial. I have been admonished that by not calling James Jones it may not be possible to obtain a jury instruction on self defense.

4/13/85        /s/ James W. Chambers

fendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Chambers' statement did not give Hager reason to believe that pursuing certain investigations would be fruitless or harmful. It does not provide Hager with any information that either discredited Jones or Jones' testimony. Rather, the statement indicates only that a defendant with an eighth grade education, relying on information provided by Hager, agreed with Hager's decision not to call Jones. Whether or not Chambers agreed with the decision not to call Jones does not make that decision any more reasonable or the investigation fruitless or harmful.

Accordingly, we conclude that reasonable counsel would have interviewed Jones. The probativeness of Jones' testimony regarding self-defense weighs heavily in this determination. He was the only person to see the entire altercation outside the bar.[8] As such, his testimony regarding Oestricker knocking Chambers down was uncontradicted. Because reasonable counsel would have interviewed Jones, Hager's decision not to do so constituted ineffective assistance.

## B. FAILURE TO CALL JONES AT TRIAL

Our analysis of Hager's decision not to call Jones as a witness parallels our analysis of Hager's decision not to interview Jones. "[S]trategic choices made after less than complete investigation are reasonable precisely as to the extent that reasonable professional judgment supports the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. Hager's decision not to call Jones thus is only as reasonable as Hager's decision not to interview Jones. That decision amounted to ineffective assistance of counsel. *See* Part (II)(A).

Furthermore, because the deference generally granted to strategic choices of trial counsel is not required due to Hager's lack of preparation, the decision not to call Jones at trial was itself unreasonable in light of all the circumstances as they appeared at the time of the second trial.

By failing to call Jones, Hager attempted to use a defense that lacked evidentiary support.[9] By failing to call Jones, Hager neglected the law of the case. *See Chambers I,* 671 S.W.2d at 783 (something more than the barroom argument and the differences in physical size—something indicating the immediacy of danger—had to be present). By failing to call Jones, Hager ignored an unbiased, uncontradicted witness who provided evidentiary support to Chambers' only defense and whose damaging testimony was merely cumlative of several of the State's witnesses' testimony. By failing to call Jones, Hager disregarded a witness whose testimony would have directly contradicted the State's theory that Chambers' barroom altercation with Oestricker was a ruse on Chambers' part to lure Oestricker outside where Chambers

---

**8.** As noted above, a gap of several seconds exists in the testimony of the government's eyewitness, Fred Ieppert. Jones had a clear view of the area outside the bar from his car. This is confirmed by the fact that the State neither cross-examined as to Jones' view of the incident nor argues on appeal that Jones was unable to see the entire incident clearly. Jones' unquestioned clear view of the incident simply emphasizes the importance of an interview with Jones.

**9.** Hager attempted to elicit sufficient evidence of self-defense through cross-examination of the State's witnesses. The alleged evidence that supported Hager's theory at the second trial was that Oestricker had a pair of pliers in his hand when he was shot. Hager questioned several of the State's witnesses about the pliers. Only one of the witnesses, Fred Ieppert, knew any information about any pliers, and Ieppert testified that he had dropped a pair of pliers when he reached in his pants pocket to pull out a handkerchief on seeing Oestricker's dead body.

Our review of the record indicates that at the time of the second trial, Hager had no reasonable basis to conclude that he would be able to elicit sufficient evidence of self-defense through cross-examination. As a matter of fact, Hager was unable to elicit sufficient evidence. Furthermore, Hager never interviewed any of the witnesses, including Ieppert, as to Oestricker's possession of pliers.

could murder him.[10] By failing to call Jones, Hager slighted testimony amounting to a mitigating circumstance at the subsequent sentencing hearing.

In sum, Hager's decision not to call Jones resulted in Chambers admitting that he had shot and killed Oestricker without any explanation that would support a verdict of less than capital murder and sentence of less than death. The State has not offered sufficient reason to support a conclusion that Hager's decision not to call Jones was reasonable.[11]

## C.  PREJUDICE

Under *Strickland*, the question remains whether, in light of all the circumstances, Hager's ineffective assistance of counsel resulted in any prejudice. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors," the "result would have been different." *Strickland*, 466 U.S. at 694–95, 104 S.Ct. at 2068; *Sanders v. Trickey*, 875 F.2d 205, 208 (8th Cir.1989). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. In this instance, prejudice occurred if Hager's deficient "conduct so prejudiced [Chambers] as to undermine confidence in the outcome of the trial" or sentencing.

*Byrd v. Armontrout*, 880 F.2d 1, 4 (8th Cir.1989).

The result of Hager's ineffective assistance to Chambers was that Jones did not testify in Chambers' behalf at trial or sentencing. Jones' testimony had great potential to aid Chambers' case. Jones was a disinterested witness who testified that Oestricker hit Chambers hard enough to knock Chambers to the ground before the fatal shot was fired. Because no one else saw what occurred outside the bar the first few moments after Oestricker exited the bar, Jones' testimony would have been given to the jury without contradiction. With Jones' testimony, the court would have instructed the jury on self-defense and permitted Hager to argue self-defense. Our review of the record indicates that only Jones' testimony substantially supported either approach.[12] The prejudice is plain.

We cannot say what would have happened at the second trial had Jones testified, but we are not confident in its verdict. Had Jones testified, a self-defense instruction would have been submitted to the jury and Hager would have been permitted to argue self-defense. The jury might have acquitted Chambers of capital murder, either by finding him guilty of a lesser charge[13] or by finding that he acted in

---

**10.** The probative value of Jones' testimony on this point is striking. If the barroom altercation was merely a ruse, as the State suggested, to provide sufficient evidence of Chambers' intent to support a capital murder instruction, then why did Chambers—according to Jones' testimony—wait until Oestricker hit him in the face, knocking him to the ground, before he shot him?

**11.** Judge Blackmar of the Missouri Supreme Court noted this point in his concurring opinion in *Chambers II*.

There is a mystery as to why the evidence that the victim struck the defendant, knocking him to the ground, which was held to require a self-defense instruction in the first trial, was not offered in the second.

*Chambers II*, 714 S.W.2d at 534 (Blackmar, J., concurring). In dissenting from a holding that there was insufficient evidence at the second trial to justify submission of a self-defense instruction, Judge Welliver of the Missouri Supreme Court stated, "The principal opinion, I fear, becomes the best evidence for proof of a

charge of ineffective counsel." *Id.* (Welliver, J., dissenting).

**12.** Even without Jones' testimony, Hager asserted that Chambers acted in self-defense or with legal provocation. Hager presented insufficient evidence, however, either to support an instruction on self-defense or to permit Hager to argue self-defense to the jury.

**13.** The State contends that the reasonable probability of being found guilty of a lesser charge does not amount to prejudice. We cannot agree. *See Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068 (prejudice is the "likelihood of a result more favorable to the defendant"). The State's interpretation of *Strickland* ignores the facts of that case. The Supreme Court explicitly recognized that prejudice can occur in sentencing alone. *Id.* Therefore, if the possibility of a shorter sentence constitutes prejudice, then the possibility of a conviction of a lesser charge resulting in a shorter sentence also constitutes prejudice.

self-defense.[14] In addition, if the jury had credited Jones' testimony at sentencing, it might not have sentenced Chambers to death.[15]

## III. CONCLUSION

At the time of the second trial, this case appeared to involve a barroom brawl or altercation. Chambers did not, and could not, deny shooting Oestricker. His only defense to the charge of capital murder and the death penalty was that he acted in self-defense. Only one witness could testify to one of the required elements of self-defense permitting either submission of the issue or argument to the jury. That witness' harmful testimony would have appeared to reasonable counsel at the time of the second trial to be cumulative rather than significantly damaging. That witness appeared credible. That witness appeared crucial to Chambers' only defense. Chambers' counsel nonetheless failed to interview or call this witness to the stand, although he knew of his existence, knew of his testimony, and was able to contact him. On these facts, we hold that Chambers received ineffective assistance of counsel and was prejudiced thereby.

Therefore, we reverse and remand to the district court with directions that it enter an order that the state either retry Chambers within 120 days of this order or free him from custody. The district court shall further order that the state notify this court and the district court of its intention in this regard within 45 days of this order.

JOHN R. GIBSON, Circuit Judge, dissenting, with whom FAGG, BOWMAN, MAGILL and BEAM, Circuit Judges, join.

I respectfully dissent.

The court today ignores the Supreme Court's instruction that in reviewing the performance of Chambers' lawyer, Hager, "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Like the district court and the state trial court that reviewed this claim, I conclude that Hager properly made a strategic judgment that Jones should not be called to testify and need not be interviewed because Jones' testimony would have been more harmful than helpful to Chambers. Furthermore, after studying Jones' testimony during the first trial, I believe that neither element of the *Strickland* test has been satisfied, and I would affirm the district court judgment denying the writ.

Although the decision of the Missouri Supreme Court, reviewing the direct appeal from Chambers' first trial, clearly states that Jones' testimony would have supported a self-defense instruction,[1] Jones was not called to testify at the second trial.

---

**14.** Missouri argues that Chambers cannot make an adequate showing of prejudice because the other evidence against him was sufficiently impressive that his failure to call Jones was not likely to alter the outcome of the case. We disagree. *See Chambers I,* 671 S.W.2d at 784 ("While the evidence of self-defense is not so unequivocal as to mandate a directed verdict of acquittal, the evidence is sufficient to justify submission of self-defense to the jury."). Assuming, however, that Jones' testimony is not likely to be outcome determinative, we would still find sufficient prejudice under the Constitution. In adopting the prejudice prong of *Strickland,* the Supreme Court stated that it believes "that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2068. The Constitution merely requires "a probability sufficient to un-

dermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

**15.** Chambers also makes two other claims: Hager's decision not to interview or call as witnesses Donald Chapman, Eleanor Hotchkiss, and Jackie Turner denied Chambers effective assistance of counsel; and Chambers was denied a fair trial because the trial court failed to submit a self-defense instruction to the jury. As to the former issue, we have carefully examined the record and find that claim to be without merit. As to the latter issue, the trial court was correct not to submit the self-defense instruction to the jury because absent Jones' testimony, insufficient evidence existed to support the theory that Chambers acted in self-defense.

**1.** The Missouri Supreme Court, in reversing the *Chambers I* judgment, observed that there was conflicting evidence as to the incident and stat-

However, the state trial court, in considering the collateral attack under Missouri's Rule 27.26, concluded that Jones' testimony, on balance, was more damaging than helpful to Chambers. After observing that Hager "could cho[o]se between a weak self-defense theory that carried with it a strengthening of the State's case," or try the case as he did, the state court concluded that the decision to not call Jones was a reasonable one.[2] The Missouri Court of Appeals affirmed the conviction, *Chambers v. State*, 745 S.W.2d 718 (Mo.Ct.App.1987), and Chambers' application for transfer to the Missouri Supreme Court was denied.

The district court, in this habeas corpus action, concluded that Jones' testimony would have supported the State's theory of the case. It also concluded that, because Hager's failure to interview Jones resulted from a strategic decision, his performance was not deficient. Because it decided that Hager rendered effective assistance, the district court did not reach the question of prejudice.[3]

## I.

The effectiveness component of the *Strickland* test asks whether the defendant received "reasonably effective assistance." 466 U.S. at 687, 104 S.Ct. at 2064. Moreover, *Strickland* teaches us that judicial scrutiny of counsel's performance must

---

ed that "[i]n examining the record for evidence of self-defense, we must consider the evidence in [the] light most favorable to appellant Chambers." *State v. Chambers*, 671 S.W.2d 781, 783 (Mo.1984) (en banc). After reviewing the evidence in that manner, the court concluded that "[w]hile the evidence of self-defense is not so unequivocal as to mandate a directed verdict of acquittal, the evidence is sufficient to justify submission of self-defense to the jury." *Id.* at 784.

**2.** The detailed reasoning of the state trial judge is as follows:

During this proceeding, Donald Hager testified that the decision not to call Jones was [a] deliberate one, based upon strategic concerns. That, having the benefit of Jones' testimony on cross-examination adduced at the first trial, in his professional opinion, the disadvantages of Jones' testimony outweighed the advantages. The State's cross-examination . . . was highly damaging in that it supported the State's theory of the case under a capital murder submission. Mr. Hager knew that although Jones' testimony would have supported a self-defense instruction, it corroborated the State's main witness—Fred Ieppert—and conflicted with his defense strategy. His strategy at trial was to: 1) attack the credibility of the State's witnesses; 2) suggest that Oestricker had a pair of pliers in his hands; and 3) attempt to negate the element of Chambers reflecting "cooly" upon . . . taking the life of Oestricker. The fact that Jones was in a position to observe the condition of the getaway car with running engine and the distance between the victim and petitioner at the time of the fatal shot would have made this trial strategy almost impossible from a practical standpoint.

\* \* \* \* \* \*

Without Jones' testimony a jury might believe, as at least one [Missouri] Supreme

Court Judge did, that the whole matter was just "an ordinary barroom altercation" thus negating the cool reflection that might not exist under those circumstances.

\* \* \* \* \* \*

In light of the foregoing, the Court finds that petitioner's trial counsel's decision not to call Jim Jones was a reasonable one based on his professional judgment in consideration of the evidence and the circumstances in the first trial.

*Chambers v. Missouri*, No. CV186–4580–CC–J3, slip op. at 12–13 (23d Cir.Ct. March 11, 1987). The court also rejected Chambers' claim that he had not read the signed statement in which he agreed with the decision to not call Jones. *Id.* at 14 n. 2.

**3.** The district court's reasoning is of interest:

The Court finds reasonable counsel's conclusion that Jones' testimony would have tended to support the state's theory of the case and thus his decision not to call Jones as a witness. This is especially true in view of petitioner's written and signed pretrial statement that he agreed with counsel's decision in this regard. As the United States Supreme Court noted, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the petitioner's own statements or actions." *Strickland, supra,* 466 U.S. at 691 [104 S.Ct. at 2066]. Furthermore, counsel reasonably assessed the affect [sic] of Jones' earlier testimony on both the state's theory of the case and Jones' credibility as a witness.

*Chambers v. Armontrout*, No. 88–0567C(3), slip op. at 12 (E.D.Mo. July 19, 1988).

be "highly deferential," *id.* at 689, 104 S.Ct. at 2065, and should eliminate the "distorting effects of hindsight," *id.*

In performing the first part of the *Strickland* analysis, courts distinguish between actions that result from inadequate pretrial preparation and those that are the product of trial strategy decisions. *See Burger v. Kemp,* 483 U.S. 776, 788–95, 107 S.Ct. 3114, 3122–26, 97 L.Ed.2d 638 (1987); *Kimmelman v. Morrison,* 477 U.S. 365, 384–87, 106 S.Ct. 2574, 2587–89, 91 L.Ed.2d 305 (1986); *Darden v. Wainwright,* 477 U.S. 168, 184–87, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986); *Strickland,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66; *United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989); *Laws v. Armontrout,* 863 F.2d 1377, 1382–86 (8th Cir.1988) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 1944, 104 L.Ed.2d 415, *reh'g denied,* — U.S. —, 109 S.Ct. 3179, 104 L.Ed.2d 1041 (1989). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. As the Third Circuit recently stated, "Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Gray,* 878 F.2d at 711.

In contrast to the close scrutiny which courts give to an attorney's preparatory activities, greater deference is given to an attorney's informed strategic choices. Indeed, it has been clear since *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Also, in reviewing the performance of counsel, "courts must resist the temptation to second-guess a lawyer's trial strategy." *Laws,* 863 F.2d at

1393 (quoting *Blackmon v. White,* 825 F.2d 1263, 1265 (8th Cir.1987)), because even a losing strategy "may have been reasonable in the face of an unfavorable case." *Id.* at 1394 (emphasis removed) (quoting *Blackmon,* 825 F.2d at 1265).

Chambers attempts to formulate arguments based upon Hager's allegedly inadequate investigation. However, as the Seventh Circuit has observed:

When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how, especially in the context of a habeas proceeding that collaterally attacks the state court conviction, the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result.

*United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1016 (7th Cir.1987).

Hager, trial counsel in Chamber's second trial, read the transcript of Jones' testimony in the first trial and concluded that the testimony was more damaging than helpful. While the court today states that Hager's decision to not interview Jones reflects inadequate preparation for trial rather than a conscious trial strategy, that conclusion ignores the fact that Hager carefully studied and analyzed Jones' testimony from the first trial and knew that any departures from it would open up a strong credibility attack. His decision to not interview Jones does not demonstrate inadequate preparation for trial, but rather a careful analysis of known testimony. The only reason for Hager to have interviewed Jones would have been to see if Jones would change his story. Hager decided not to interview Jones because even any substantial, beneficial changes in his story would have created an excessive danger of devastating impeachment. *Chambers v. State,* 745 S.W.2d at 720. Furthermore, as is clear from Jones' testimony at the 27.26 hearing, the only new information that an

interview would have produced was Jones' rather lame explanation that when he said that Chambers had held the gun "back here" and against his leg, he did not mean that it was hidden. *See ante* at 827 n. 2, 829–830 n. 5. Such an embellishment is precisely the sort of a change that could have led to damaging cross-examination of Jones, particularly because Jones had explicitly stated at the first trial that Chambers was not displaying the weapon. (*Chambers I* Tr. at 740–41).

My study of the record convinces me that both the state trial court and the district court properly assessed Jones' testimony. At the first trial, Jones testified that Chambers arrived in a car which was turned to face the exit from a bar's parking lot. (*Chambers I* Tr. at 748). As Chambers entered the building, the car was left running and was still occupied by the driver. (*Id.* at 748–49). Jones testified that he saw Chambers come out the door, get about half the distance of an automobile or truck, and turn half-way toward the door. (*Id.* at 738). Oestricker followed Chambers out of the door and struck Chambers hard enough to knock him down. (*Id.*). Chambers then got up, took a step forward, and shot Oestricker. (*Id.*).

However, on cross-examination, Jones revealed that when Chambers walked out the door and turned around half-way, he already had a pistol in his hands, (*Id.* at 740), with the gun against his leg and positioned behind him, (*Id.* at 741). Oestricker was just emerging through the door when Chambers stopped, turned around with the gun in hand, and waited for Oestricker to come out. (*Id.* at 741–42). Jones also testified that he had not seen Oestricker attempt to strike Chambers before Chambers initially took the gun out. (*Id.* at 742). According to Jones, after Chambers shot Oestricker, Chambers said either "[t]ake that, tough guy," or "[t]ake that." (*Id.*). After being shot, Oestricker made a grunting sound and backed up three or four steps. (*Id.*). Chambers then walked toward him and slapped him in the head with the pistol "[o]ver and over and over again." (*Id.* at 742–43). Furthermore, Oestricker was standing about six feet away from

Chambers at the time of the shot and was not moving toward Chambers. (*Id.* at 747). Jones also said that, after shooting Oestricker, Chambers walked into the building and asked "if anybody else wanted any of this." (*Id.* at 746). As he left the building, Chambers said to Oestricker, "Lay there and die." (*Id.* at 747).

Based upon this testimony, I cannot conclude that Hager acted in an unreasonably ineffective manner by deciding to not call Jones. Even if Jones' testimony supported a self-defense instruction, as the Supreme Court of Missouri held, the testimony also indicated that Chambers, with a pistol concealed against his leg, both waited for Oestricker to come out of the door and, after being struck, fired the fatal shot while Oestricker was six feet away and was not moving toward him. After threatening the crowd in the bar, Chambers ran to the car which had waited for him, with its motor running, during the entire incident.

While the question of whether there was enough evidence to support a self-defense instruction involves considering the evidence in the light most favorable to Chambers, a professional evaluation of the testimony's trial impact involves considering it in the light that the jury would consider it. This is a far broader analysis, and I cannot conclude that Hager was unreasonably ineffective in his assessment of the impact of Jones' testimony on the jury. The Supreme Court has refused to find ineffective assistance where a lawyer did not introduce helpful evidence which, in turn, could have led to the introduction of other more harmful testimony. *See Burger*, 483 U.S. at 788–95, 107 S.Ct. at 3122; *Darden*, 477 U.S. at 184–87, 106 S.Ct. at 2473–74. The testimony by Jones presented just such a dilemma for Hager, and we should follow the teaching of the Supreme Court by refusing to hold that there was ineffective assistance in this respect.

The court today has only one answer to the damaging aspects of Jones' testimony: it states that "any damaging testimony that Jones gave at the first trial was cumulative." *Ante* at 829–830. An appellate court often categorizes testimony as cumu-

lative in deciding evidence questions, but this is no answer at all in the context of evaluating Hager's decision. While the court establishes conclusively that testimony by James Fowler, Fred Ieppert, Dennis Simmons and several other witnesses overlapped with testimony by Jones, *ante* at 829–830 n. 5, it fails to establish that Jones' testimony would have had only a negligible impact on the jury, thus underscoring the wisdom of Hager's decision to not call Jones to testify. Jones was the only witness who saw the whole incident outside the bar. Hager, when evaluating the probable impact of Jones' testimony on the jury, could have reasonably concluded tht Jones' testimony would drive the damaging points home to the jury. That strategic decision is one that must be viewed from the testimony's impact on the jury, because we are here deciding how the jury's verdict would have been affected. An appellate court engages in a far different exercise when it concludes that evidence is cumulative in deciding whether evidence either should have been admitted or excluded, or whether error was harmless or prejudicial. It was the jury impact, however, that Hager analyzed.

Moreover, the court's assertion that all of Jones' harmful testimony was already before the jury in the second trial[4] is patently incorrect. Had Jones testified at the second trial, he would have introduced an important piece of information that would have helped establish an element of capital murder, and he would have hurt Chambers by directly contradicting the testimony of another witness.

At the first trial, Jones testified Chambers arrived in a car that made a U-turn to face the street, that someone stayed in the car while Chambers went inside, that Chambers was inside the bar for only two or three minutes, *and that the car's engine was left running during the entire episode. (Chambers I* Tr. at 748–49). At the second trial, the jury was instructed that it could convict Chambers of capital murder only if it found that he "considered

taking the life of Jerry Lee Oestricker and reflected upon this matter coolly and fully before doing so." (*Chambers II* Tr. at 681). The most damning evidence of cool planning was Jones' testimony that the car was left running, because that testimony undercuts Chambers' theory that he innocently went into the bar to drink with Oestricker, but it squarely supports the State's theory that Chambers planned the shooting even before entering the bar. Because Jones was not called at the second trial, the jury at that trial was unaware of this damaging information.

Jones also would have hurt Chambers by directly contradicting the testimony of Fred Ieppert, the only witness besides Jones who testified concerning the events that immediately preceded the shooting. At the first trial, both Jones and Ieppert testified that Chambers shot Oestricker while Oestricker was standing still, approximately six feet away from Chambers. (*Chambers I* Tr. at 464, 746–47, 750–51). After Hager confronted Ieppert with statements that Ieppert had made at a pre-trial hearing, however, *Ieppert testified at the second trial that Oestricker was moving toward Chambers when the shot was fired. (Chambers II* Tr. at 446, 451). Ieppert's testimony at the second trial helps support a self-defense theory. Had Jones testified at the second trial, he would have directly contradicted Ieppert. Thus, it is difficult to understand how the court can call this part of Jones' testimony "cumulative."

It is also important to consider the fact that, before the second trial, Chambers signed a statement in which he agreed with the decision to not call Jones. The Supreme Court stated in *Strickland* that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," 466 U.S. at 691, 104 S.Ct. at 2066, and that those statements are critical to a proper assessment of litigation decisions, *id.* When Chambers' signed state-

---

4. Although the court today relies upon testimony from both trials, it does not explain why testimony at the first trial, by witnesses other than Jones, is relevant to the question of whether Jones should have been called at the second trial.

ment is considered in combination with the content of Jones' testimony at the first trial, I am convinced that the decision to not call Jones was reasonable under *Strickland.*

The court, purporting to answer arguments made by the State, engages in a substantial discussion of Jones' credibility.[5] The court's affirmation of Jones' credibility hardly supports its position today, however, because Jones' believable testimony simply hammered home the State's case.

The court views Hager's actions in a myopic sense when it concludes that Jones was not called as a witness because he was not interviewed. Hager had the full benefit of the trial transcript of Jones' earlier testimony and made a careful strategic determination that the testimony was more harmful than helpful and that any changes in the testimony would open Jones up for vigorous cross-examination that would hurt Chambers. We should not second-guess that decision or place it in a light contrary to that required by *Strickland.*

In holding that Hager's assistance was unreasonably ineffective, the court today reaches a result contrary to that reached in earlier decisions in which we recognized that *Strickland* is not violated when a counsel, in the exercise of professional judgment, decides not to produce mitigating evidence that could reasonably be considered more damaging than helpful. In *Smith v. Armontrout,* 888 F.2d 530 (8th Cir.1989), we held that certain medical records would have hurt the defendant at least as much as they helped, and we refused to flyspeck the decision of a lawyer long after the fact. *Id.* at 534–35. Similarly, in *Swindler v. Lockhart,* 885 F.2d 1342 (8th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990), we held that it was not unreasonable for counsel to refrain from offering into evidence medical reports, concerning the defendant's mental condition, that he felt to be more damaging than helpful. *Id.* at 1352–53. *See also Laws,* 863 F.2d at 1387–91.

## II.

Even if Hager should have called Jones, the *Strickland* test is not satisfied unless Chambers can also demonstrate "that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In order to prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is defined as one which is "sufficient to undermine confidence in the outcome." *Id.* After a thorough examination of the record, I conclude that there is not a reasonable probability that the introduction of Jones' testimony would have changed the outcome of the second trial.[6]

Accordingly, I would affirm the judgment of the district court denying the writ.

---

5. The statement that the Missouri Supreme Court found Jones' testimony credible is simply not based upon its opinion. *See ante* at 827 n. 1. The fact that the State did not attempt to impeach Jones' credibility is completely understandable in light of the support that Jones gave to the State's version of the case.

6. We need not discuss in detail the statement and assumption made by the court today that the two trials were essentially the same except for the fact that Jones was not called at the second trial. There were significant differences which point to the strength of the defense waged by Hager. For example, under cross-examination at the second trial, but not at the first, Kenneth Vaughn stated that Oestricker was drunk and "wanting to fight like crazy—wanting to fight anybody." (*Chambers II* Tr. at 385). Hager also significantly impeached several of the other witnesses. (*See, e.g., Chambers II* Tr. at 581–615) (Testimony of James Fowler).