

# Missouri Court of Appeals

## Southern District

### en banc

STATE OF MISSOURI, )
)
          Respondent, )
)
  vs. ) No. SD33982
) Filed: August 3, 2016
JEFFREY L. BRUNER, )
)
          Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable Gayle L. Crane, Circuit Judge

### **AFFIRMED**

A jury convicted Jeffrey L. Bruner ("Bruner") of first-degree murder and armed criminal action. Bruner was sentenced to life in prison without parole on the murder conviction, and five years in prison for the armed criminal action, with the sentences to run concurrently. Bruner presents one point on appeal asserting the trial court erred in failing to give the jury a self-defense instruction. Finding no merit to Bruner's point, we affirm the trial court's judgment and sentence.

### Factual and Procedural Background

In *State v. Smith*, 456 S.W.3d 849 (Mo. banc 2015), our supreme court considered the failure of the trial court to submit a self-defense instruction. As it commenced the discussion of the factual and procedural background, the court reviewed the evidence "in the light most favorable

to the verdict[.]" *Id.* at 850. We do not do so here because in reviewing whether the trial court erred in failing to submit a self-defense instruction, we view the evidence in the light most favorable to the defendant. *Id.* at 852. This standard of review contemplates focusing on the best possible evidence for defendant, even where that evidence conflicts with defendant's own testimony, to determine whether self-defense was put at issue. *Id.* We mention contrary evidence only to provide context for Bruner's contentions. *Gale v. State*, No. SD34119, 2016 WL 3569416, at *2 (Mo.App. S.D. June 30, 2016).

Bruner and his wife, Michelle Bruner ("Wife"), were estranged and Wife moved out of the marital home approximately two weeks before November 1, 2013. While Bruner and his daughter were eating out on the evening of November 1, 2013, Bruner's daughter showed Bruner a picture that had been posted on Facebook of Wife and Victim, taken outside of what appeared to be a nearby movie theater. Bruner was "stunned" when he saw the picture and told his daughter "this isn't right. You know, what your mom is doing is not right." He was also "hurt," "angry," and felt "betrayed." Bruner decided to go to the theater and confront Wife. Bruner's daughter did not want to go with Bruner and asked that he take her home. On the way home, the daughter testified Bruner told her "he didn't want [her] to see him kill a man[,]" that she probably would not have a "mom or a dad by the end of the night[,]" and "he would be going to jail that night[.]"[1]

Upon arriving home, Bruner again viewed the picture of Wife and Victim. He then retrieved two loaded pistols from the house because of "how big [Victim] was in the picture." Bruner returned to his car, one pistol concealed upon his person, the other placed in the passenger

---

[1] Bruner disputed his daughter's testimony, testifying instead that he told her, "It's not like I'm going to kill a guy." He also denied telling his daughter that he was going to jail that night, but testified he actually told her, "I wouldn't put it past mom to try to put me in jail."

2

seat along with an extra ammunition clip. On the way to the theater, Bruner texted Wife asking "WTF," and a second text asking her where she was. Wife did not respond.

Arriving at the theater, Bruner unsuccessfully scoured the parking lot for Wife's Jeep. After several laps around the parking lot, Bruner parked in a space facing the theater. Bruner texted his daughter to determine if she was okay, and then sought to confirm what clothing Wife was wearing that night. After a significant period of time, Bruner observed Wife emerge from the theater with Victim. Bruner left his vehicle and approached the two, asking Wife, "[W]hat's going on[?]" Wife replied, "We're on a date." Bruner responded that "they had not talked about dating," and Wife told Bruner she did not need his permission to date. An argument then ensued between Bruner, Victim, and Wife. Victim asked Bruner who he was and Bruner responded, "This doesn't have to do with you. I just want to talk to my wife[.]" Victim stated, "She moved out pal."

Bruner observed Victim to be considerably larger than he was—Bruner was 5'11" and approximately 170 pounds; Victim was approximately 6'5" and "was really big." As Victim would approach Bruner during this argument, Bruner would take a few steps back. However, Bruner continued to remain in front of Victim even when Victim would move forward. Eventually, the procession reached the street opposite the movie theater entrance. Bruner saw a median emerging out of his peripheral vision, and not wanting to trip over it, stopped moving backward. Wife and Victim walked around Bruner to his right, causing Bruner to pivot clockwise toward Wife and Victim.

Bruner testified on direct examination that at that point, Victim exclaimed, "I'm not from here, mother fucker, I'll have your throat slit in two hours." Bruner asked why Victim was threatening him, and Victim indicated he did not play "these redneck games." Victim stepped onto the median and said "you don't know who the fuck you are messing with." Bruner saw Victim

3

move into a "fighting stance" and move his right arm such that Bruner perceived Victim was going to grab him.[2] Bruner then pulled the pistol from his jacket and shot Victim several times in the back, killing him.

A three-day jury trial commenced on March 23, 2015. At the jury instruction conference, Bruner's counsel tendered a self-defense instruction, pursuant to MAI-CR 306.06, Part A – General Statement of Law, which the State opposed.[3] The trial court refused the instruction.

---

[2] Several witnesses testified that Bruner, Wife, and Victim were engaged in an argument with Bruner yelling at Wife. They observed no pushing, shoving or any physical contact between Bruner, Wife, and Victim before Victim was shot. The only physical contact was after Bruner shot Victim and Bruner was seen kicking Victim in the stomach and head while he was lying on the ground.

[3]                                                INSTRUCTION NUMBER [A]
PART A - GENERAL INSTRUCTIONS
          One of the issues in this case is whether the use of force by the defendant against Derek Moore was lawful. In this state, the use of force, including the use of deadly force, to protect oneself is lawful in certain situations.
          In order for a person lawfully to use force in self-defense, he must reasonably believe such force is necessary to defend himself from what he reasonably believes to be the imminent use of unlawful force.
          But, a person is not permitted to use deadly force unless he reasonably believes that the use of deadly force is necessary to protect himself against death or serious physical injury.
          As used in this instruction "deadly force" means physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.
          As used in this instruction, the term "reasonably believe" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.
PART B - CASE-SPECIFIC STATEMENT OF LAW
          On the issue of self-defense as to Count I you are instructed as follows: First, if the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force by Derek Moore, and
          Second, the defendant reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury from the acts of Derek Moore, then his use of deadly force is justifiable and he acted in lawful self-defense.
          The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense under this instruction, you must find the defendant not guilty under Count I.
          As used in the instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.
PART C - EVIDENTIARY MATTERS
          Evidence has been introduced of threats made by Derek Moore against defendant. You may consider the evidence in determining who was the initial aggressor in the encounter.

4

The jury found Bruner guilty of first-degree murder and armed criminal action, and recommended life imprisonment without parole on the first-degree murder charge, and five years' imprisonment on the armed criminal action charge. On June 15, 2015, the trial court took up Bruner's motion for new trial asserting trial court error in refusing Bruner's Instruction A, the self-defense instruction. After hearing argument, the trial court overruled the motion. The trial court then imposed sentence pursuant to the jury's recommendation. This appeal followed.

In his sole point relied on, Bruner argues that the trial court erred in failing to submit a self-defense instruction to the jury.

## Standard of Review

We review a trial court's decision not to submit a self-defense instruction *de novo*. **State v. Johnson**, 470 S.W.3d 767, 768 (Mo.App. E.D. 2015). In so doing, we view the evidence in the light most favorable to the defendant. **Smith**, 456 S.W.3d at 852.

## Analysis

Bruner argues there was sufficient evidence for a self-defense instruction, and that the trial court therefore erred in failing to submit that instruction to the jury.

"The circuit court must submit a self-defense instruction when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony, and failure to do so is reversible error." **Smith**, 456 S.W.3d at 852 (internal quotation and citation omitted). "'Substantial evidence' is evidence putting a matter in issue." **State v. Avery**, 120

---

If any threats against defendant were made by Derek Moore and were known by or had been communicated to the defendant, you may consider this evidence in determining whether the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force by Derek Moore.

You, however, should consider all of the evidence in the case in determining whether the defendant acted in lawful self-defense.
MAI-CR306.06A
Submitted by Defendant

S.W.3d 196, 200 (Mo. banc 2003). "Whether the evidence raises the issue of self-defense is a question of law." *State v. Nunn*, 697 S.W.2d 244, 246 (Mo.App. E.D. 1985).

A defendant may be justified in the use of physical force when he reasonably believes such force is necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful force by another. § 563.031.1, RSMo Cum.Supp. (2013). The use of deadly force, however, requires he "reasonably believes that such deadly force is necessary to protect himself . . . or another against death, serious physical injury, or any forcible felony[.]" § 563.031.2(1), RSMo Cum.Supp. (2013). "Reasonably believe" means "a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false." MAI–CR 3d 306.06A[6]. "Deadly force" means "physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury." MAI–CR 3d 306.06A[5].

For a defendant to be entitled to the submission of self-defense instructions in the use of deadly force, there must be substantial evidence putting in issue four prerequisites:

> (1) an absence of aggression or provocation on the part of the defender, (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity, and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life.

*State v. Thomas*, 161 S.W.3d 377, 379 (Mo. banc 2005).

Here, even when considering the evidence in the light most favorable to Bruner, there was not substantial evidence of such elements in order to warrant a self-defense jury instruction. Compiling the facts most favorable to Bruner, there was evidence that Victim cursed at Bruner, that Victim stepped toward Bruner several times causing Bruner to step back, that Victim was

6

physically larger than Bruner, that Victim threatened to have Bruner's throat slit in two hours, and that Victim stepped up on a median and moved his right arm such that Bruner perceived that Victim was "trying to grab him." This is not sufficient evidence for a self-defense instruction.

The dissent's portrayal of self-defense evidence (and maybe more importantly, purported inferences therefrom, few or none of which Bruner ever asserted during trial) overlooks a more fundamental requirement that there be *substantial* evidence to support the self-defense instruction.

There was no substantial evidence from which a reasonable fact-finder could deduce that there was a real or apparent necessity for Bruner to kill in order to save himself from an immediate danger of serious bodily harm or death. From the most favorable view, the evidence was that Victim made a verbal threat to Bruner that, "I will have your throat slit within two hours." That threat, coupled with the Victim moving into a fighting stance and "raising his arm," is not substantial evidence of "a real or apparently real necessity for [Bruner] to kill in order to save himself from an *immediate* danger of serious bodily injury or death." *Id.* "Immediate" means instant, without the passage of time. "[T]he mere possibility that an event may happen in the future does not create an *immediate* danger underlying the right to kill in self-defense." *State v. Martin*, 666 S.W.2d 895, 899 (Mo.App. E.D. 1984) (emphasis added). There was no evidence that Victim had a knife. In fact, the *only* evidence presented was that Victim did *not* have a knife—and even more importantly as to self-defense—Bruner *never thought* Victim had a knife. There is not only lacking a positive quantum of evidence in support of this element—there is no substantial evidence. There is not a positive quantum of evidence to meet any of the definitions of "substantial evidence" set forth in *State v. Weems*, 840 S.W.2d 222, 226 (Mo. banc 1992).

In *Dorsey v. State*, 113 S.W.3d 311, 316 (Mo.App. S.D. 2003), this Court explained that "[i]n order to be entitled to a self-defense, the defendant may not use more force than what appears

7

reasonably necessary and mere battery would not justify the use of a weapon against an unarmed assailant." Given that there was no evidence that Victim had a knife, or any other deadly weapon or dangerous instrument (in fact positive evidence that Victim did not), or that Bruner ever thought, reasonably or otherwise, that Victim had any deadly weapon or dangerous instrument, *Dorsey* dictates that there was no real or apparent necessity for Bruner to use deadly force.

There is no reasonable available inference from this evidence that would create the immediate danger underlying the right to kill in self-defense. "An inference is a conclusion that is drawn from established facts and must be both logical and reasonable." *State v. Mickle*, 164 S.W.3d 33, 50 (Mo.App. W.D. 2005). It is neither logical nor reasonable to conclude that there was a real or apparent necessity for Bruner to kill to save himself from an immediate danger of serious bodily injury or death.

Mere insults are insufficient provocation to justify an assault, much less a killing. *State v. Wiley*, 337 S.W.3d 41, 45 (Mo.App. S.D. 2011). Bruner testified that it appeared to him that Victim was reaching for him, but even where there is an assault and battery without a weapon, Missouri courts have obliged the victim to endure the assault without resorting to the use of deadly force. *Id.* Further, while Victim said he would have Bruner's throat slit in two hours, this amounted to mere threat, which is insufficient for self-defense. *Smith*, 456 S.W.3d at 852.

There also is no substantial evidence to support the third element under *Thomas*, that there be "a reasonable cause for the defender's belief in such necessity" to use deadly force. 161 S.W.3d at 379. Victim was larger than Bruner, and stepped onto a median making him appear even taller. It does not follow from this evidence that Bruner's belief of having his throat slit was any more reasonable. No matter Victim's size or physical position in relation to Bruner, Bruner affirmatively testified that Victim did not have a knife with which to carry out his threat. It would

8

have been, based on the evidence in the light most favorable to Bruner, unreasonable for Bruner to believe in the need to use deadly force. *See **Dorsey***, 113 S.W.3d at 316.

Finally, there is no substantial evidence that Bruner did "all within his power consistent with his personal safety to avoid the danger and the need to take a life," the fourth element under ***Thomas***. Bruner indicated that he backed away from Victim, and then stopped in front of a median. However, even Bruner testified that he should have simply left the scene. Further, the only evidence presented was that Bruner shot Victim several times in the back, and then when Victim fell to his knees, Bruner shot Victim several more times. That Bruner backed away from Victim early in the encounter does not obviate the fact that he shot Victim while Victim's back was turned and while Victim was lying on his hands and knees on the ground.

In ***State v. Chambers***, 714 S.W.2d 527 (Mo. banc 1986), our supreme court examined a self-defense instruction after a prior conviction was reversed for failure to give such an instruction. The facts at the second trial demonstrated the defendant entered a bar and verbally confronted the victim, leading to an argument. Victim told defendant that defendant did not scare him and that defendant could have a piece of him if defendant wanted. Defendant left the bar. Within seconds after victim left the bar, witnesses reported defendant hit victim with a pistol, knocked victim to the ground, and then shot victim when victim got up with his hands raised in the air. Before the shot, another witness yelled that victim had a knife, but there was no weapon of any kind found on victim. The supreme court concluded that there was no trial court error in refusing the instruction at the second trial, explaining:

> Furthermore, the evidence which defendant relies upon to support his theory of self-defense is woefully unconvincing that there existed either an apparent or real necessity for him to use deadly force to avoid serious bodily injury or death.

9

Additionally, defendant's construction of the facts in this case fails to notice an absence on his part to do all within his power consistent with his personal safety to avoid the danger and the need to take the victim's life.

Instead of immediately leaving the bar, he actively encouraged the victim to accompany him outside to settle the argument. And waiting outside the bar was the car in which defendant arrived. Rather than avoid any real or apparent danger that existed, defendant instead chose to confront the victim. Only after defendant knocked the victim to the ground, shot him in the chest, and beat the victim further did defendant flee in the waiting vehicle.

We have conducted a searching examination of the trial transcript and have considered the evidence in a light most favorable to defendant, and we are unable to conclude that there was sufficient evidence to support an instruction on self-defense or to allow the trier of fact to conclude that defendant's conduct was reasonable. Thus, we find no error in the trial court's refusal to submit defendant's tendered instruction on self-defense.

*Chambers*, 714 S.W.2d at 531. As in *Chambers*, the evidence here is woefully unconvincing to support a self-defense instruction.

When our supreme court recently examined a case with similar facts in *Smith*, 456 S.W.3d 849, the court considered the evidence in the light most favorable to defendant and observed:

[Victim] threatened to fight, yelled at, and came within inches of [Defendant]. [Victim] neither hit nor exhibited a weapon to [Defendant]. No one, including [Defendant], saw a weapon on [Victim] during the incident. [Defendant] testified that not until [Victim] had run away and stopped between two dumpsters did he 'figure' that [Victim] was looking for a gun.

*Id.* at 852. Based on these facts, our supreme court held that defendant "was not faced with a real or apparently real necessity to use deadly force to defend himself against [Victim] when he fired the first gunshot before [Victim] ran away." *Id.* On that basis, the court held that the trial court did not err in refusing to submit a self-defense instruction to the jury below. *Id.*

Here, like in *Smith*, Victim yelled at, threatened, and moved close to Bruner, but there was no evidence that Victim exhibited or possessed any sort of weapon. Based on these facts, which the supreme court found decisive in *Smith*, it would simply be inconsistent to find that the trial

10

court in the present case erred in not submitting a self-defense instruction.  Indeed, it was *Smith*, handed down just two weeks earlier, that was discussed at *this* instruction conference before the trial court refused Bruner's tendered self-defense instruction.

The trial court did not err in failing to submit a self-defense instruction.  The judgment and sentence of the trial court are affirmed.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

MARY W. SHEFFIELD, C.J. - CONCURS

NANCY STEFFEN RAHMEYER, J. – CONCURS

JEFFREY W. BATES, J. - CONCURS

GARY W. LYNCH, J. – DISSENTS IN SEPARATE OPINION

DANIEL E. SCOTT, J. – CONCURS IN SEPARATE OPINION

DON E. BURRELL, JR., J. – CONCURS IN DISSENTING OPINION


| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| vs. | )   No. SD33982 |
| | ) |
| JEFFREY L. BRUNER, | ) |
| | ) |
| Appellant. | ) |

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable Gayle L. Crane, Judge

### **CONCURRING OPINION**

Let us assume *arguendo* that instructional error occurred. Still, prejudice must be "judicially determined," Rule 28.02(f), and presumed prejudice is overcome if the omitted instruction was unlikely to have changed the verdict. Here we do not slant our view in Bruner's favor (as on his claim of error) but must consider the *whole* record: an avalanche of evidence, plainly believed by the jury, that Bruner deliberately murdered Derek Moore, including that:

- Hours before the killing, Bruner told his daughter he did not want her to see him kill a man; she probably would not have a mom or dad by the end of the night; and that he would go to jail that night.

- Bruner had his daughter pull up Moore's photo on her laptop, then armed himself with two guns and extra ammunition, drove to the movie theater, parked up front, and waited more than an hour.

- Moore and Mrs. Bruner came out, and after a brief encounter in front of the theater, Bruner pulled a gun and shot Moore from behind until Moore dropped, his spinal cord severed.

- Bruner stood over Moore and emptied the gun into his back, then kicked Moore's head and face with heavy boots as he lay dying.

- Waiting for police to arrive, Bruner said: "They posted it all over Facebook. What's a guy supposed to do?"

This volume of evidence likely is why the defense did not mention self-defense in voir dire, opening statement, or otherwise before the jury. The defense theory, supported by a testifying expert, was that a mental disease or defect caused Bruner to "snap," "explode," and kill Derek Moore. Yet, despite instructions on that defense and sudden-passion manslaughter and second-degree murder, the jury's verdict was *first-degree* murder, which belies self-defense in that "the element of deliberation serves to ensure that the jury believes the defendant acted deliberately, consciously and not reflexively." ***State v. Nathan***, 404 S.W.3d 253, 266 (Mo. banc 2013).[1]

Perhaps reasonable minds could differ as to error in this case, but not prejudice. If I am sure of anything, I am sure that a self-defense instruction would not have changed the verdict; that no reasonable lay or legal mind could review the whole record and disagree; and that a second trial would needlessly increase pain and grief for those on both sides of this tragedy. These are not gratuitous observations, but the product of Rule 28.02(f) review, counseling us to affirm even if the trial court erred.

That said, I join the majority in finding no error. To lawfully shoot Moore, Bruner had to *reasonably* fear *imminent* death or serious injury at Moore's hand.

---

[1] I cannot do justice to the prosecutor's certain shredding of Bruner's credibility on cross-examination, which doubtlessly contributed to the outcome.

2

***State v. Smith***, 456 S.W.3d 849, 852 (Mo. banc 2015).  This objective standard, ***id***.,

is "based on what a hypothetical ordinary reasonable and prudent person would have

believed and how they would have reacted."  ***State v. Edwards***, 60 S.W.3d 602, 612

(Mo.App. 2001).  No "ordinary reasonable and prudent" person would have gunned

down Derek Moore, even if we give credit to Bruner's every word.[2]

Compare ***Smith***, the latest controlling supreme court decision. It predictably

noted that courts must view the evidence most favorably to the defendant in deciding

whether to instruct on self-defense. 456 S.W.3d at 852.  Presumably applying that

standard, our state's highest judges then *unanimously* observed that

> the record reveals that Williams threatened to fight, yelled at, and
> came within inches of Smith.  Williams neither hit nor exhibited a
> weapon to Smith.  No one, including Smith, saw a weapon on
> Williams during the incident.  Smith testified that not until Williams
> had run away and stopped between two dumpsters did he "figure"
> that Williams was looking for a gun [*i.e.*, after Smith already had
> "fired his gun three or four times," ***id.*** at 851].
>
> Accordingly, Smith was not faced with a real or apparently real
> necessity to use deadly force to defend himself against Williams ....
> Accordingly, the circuit court did not err in its refusal to submit a
> self-defense instruction.

***Id***. at 852. "The record in this case does not establish that Smith reasonably believed

the use of deadly force was necessary." ***Id***.

What our supreme court emphasized in ***Smith*** strikingly mirrors this case.  As

in ***Smith***, Bruner testified that Moore threatened and came within inches of him, but

did not hit him or exhibit a weapon.  As in ***Smith***, no one, including Bruner, saw a

---

[2] Thus the defense trial theory that Bruner "snapped," exploded," and killed Moore
because Bruner had a mental disease or defect, not that any "ordinary reasonable and
prudent person" would have slain Moore likewise.

weapon on Moore. Even the one difference cuts against Bruner. Defendant Smith at some point figured his adversary was looking for a gun, but Bruner expressed no such concern – not at the scene; not even at trial. It is no wonder that **_Smith_**, then freshly decided, was cited at this instruction conference and seemingly followed by this trial court in rejecting Bruner's proposed self-defense instruction.

I agree with **_Smith_**. Being struck (or not), and especially fearing that one's adversary has a weapon (or not), seem highly relevant in determining whether one could lawfully answer with deadly force in **_Smith_** or in this case.

I have carefully considered Bruner's argument, credited by our dissenting colleagues, that such considerations may violate our duty to view a self-defense record most favorably to the defendant. But **_Smith_** shows that Bruner's argument goes too far. Say a defendant agrees, and never controverts, that he was not struck, saw no weapon, thought his adversary was unarmed, and that an autopsy showed the victim had been shot in the back. I cannot see how or why judges would ignore these in deciding whether the defendant had raised a triable issue as to use of deadly force. Such considerations may not be decisive in a given case, or the judge may err on the side of caution and instruct anyway, but those are not the issue now before us.

The narrow issue raised by Bruner's argument is whether in weighing the necessity to instruct on use of deadly force, courts must ignore, _e.g._, a defendant's uncontroverted testimony that he shot a victim who never struck him and who the defendant knew had no weapon, or uncontroverted medical proof that the victim had

been shot in the back.  I don't think our duty to view the record favorably to the defendant goes that far, and I think **Smith** confirms this.  I concur.

DANIEL E. SCOTT – CONCURRING OPINION AUTHOR



# Missouri Court of Appeals
## Southern District
### en banc

STATE OF MISSOURI,           )
                                 )
     Plaintiff-Respondent,    )
                                 )
vs.                            )     No. SD33982
                                 )
JEFFREY LEE BRUNER,     )
                                 )
     Defendant-Appellant.    )

### DISSENTING OPINION

I respectfully dissent. When viewed in accordance with our standard of review, the trial record contains evidence putting self-defense at issue.

Defendant does not challenge the sufficiency of the evidence supporting his convictions but rather raises the narrow legal issue of whether his requested self-defense instruction should have been submitted to the jury. In addressing that issue, we are required by our standard of review, as established by our supreme court,[1] to view the *evidence* presented at trial "in the light most favorable to the defendant and the theory propounded by the defendant." *State v. Westfall*, 75 S.W.3d 278, 280 (Mo. banc 2002). In viewing the evidence in this manner, we give the proponent of the requested instruction the benefit of all reasonable inferences and disregard evidence to the contrary. *Wampler v. Speake*, 479 S.W.3d 771, 772 (Mo.App. 2016); *French v.*

---

[1] "The supreme court shall be the highest court in the state. . . . Its decisions shall be controlling in all other courts." Mo. Const. art. V, § 2.

***Missouri Highway & Transp. Comm'n***, 908 S.W.2d 146, 150 (Mo.App. 1995). We ignore contrary evidence even if it comes from the defendant's testimony, *see **Westfall***, 75 S.W.3d at 281 (favorable evidence may be inconsistent with the defendant's testimony). Yet, the favorable evidence "may come from the defendant's testimony alone as long as the testimony contains *some* evidence tending to show that he acted in self-defense." ***Id.*** at 280 (emphasis added). Because the "'jury may accept part of a witness's testimony, but disbelieve other parts,'" ***State v. Jackson***, 433 S.W.3d 390, 399 (Mo. banc 2014) (quoting ***State v. Williams***, 313 S.W.3d 656, 659 (Mo. banc 2010)), only that part of the defendant's testimony favorable to self-defense should be considered, and those parts of the defendant's testimony contrary to that defense should be disregarded and ignored.

This standard is constant, regardless of how improbable the favorable evidence may be or how compelling the contrary evidence may be.[2] Because this standard of review mandates that we ignore all contrary evidence presented to the jury during the trial, a large amount of evidence that the jury heard and saw during the trial is not included or mentioned in this dissenting opinion. This is so because our function is not to determine the *facts*—what actually happened. That function is solely assigned to and within the province of the jury to determine from the totality of the *evidence* presented during the trial.[3] Rather, our function is to determine whether the jury was properly instructed as to the applicable law so that once it determined the *facts*— what actually happened—those instructions would direct the jury to make the correct legal

---

[2] To the extent the majority fails to disregard and ignore contrary evidence and relies upon it (1) for "context" to discount the probative force of favorable evidence, (2) because it came from Defendant's testimony, (3) because it is a "fact," or (4) for support of its conclusion that the favorable evidence "is woefully unconvincing," it moves into the prohibited roles of reweighing the evidence and becoming a super juror. *See **State v. Brinkley***, 366 S.W.3d 104, 105 (Mo.App. 2012) (in reviewing the evidence in the light most favorable to the conviction for sufficiency, "[w]e do not reweigh evidence or act as a 'super juror' with veto powers.")

[3] "Unless waived, the right to trial by jury means that the jury—and only the jury—will decide what the evidence does and does not prove beyond a reasonable doubt." ***State v. Jackson***, 433 S.W.3d 390, 402 (Mo. banc 2014).

2

decision based upon those *facts*. In that context and in accordance with our standard of review, the following *evidence* favorable to Defendant and his self-defense theory was presented at trial.

Defendant and Michelle Bruner ("Wife") married in 1992. Over the course of the marriage, the couple had periods of marital difficulties and separation but had always reconciled. Around October 15, 2013, Wife moved out of the marital home into an apartment. When she moved out, Wife denied that she was involved with another man or that she planned on divorcing Defendant and said she just "needed space." Defendant believed that no one else knew the couple had separated, and that he "knew it would be hard for her to come back, if everybody knew what she was doing." After Wife moved into the apartment, Defendant visited her "at least every other day[,]" and "spent two nights there with her."

On October 31, 2013, Defendant bought Wife a small gift and arranged to meet her at her workplace to give it to her. When they met, Wife acted different, "[k]ind of cold and something didn't feel right." Defendant asked her if they could go out the next night, but Wife said she had to work.

The next night, however, Wife went on a date with Derek Moore, and a photo of the two of them was posted on her Facebook page with the caption, "date night." Defendant's fourteen-year-old daughter saw the post and showed the photo to Defendant while they were out having dinner that evening. Defendant was stunned, hurt, angry, and upset because Wife had told him she had to work that night. It appeared to Defendant that the photo was taken at the local theater. Defendant texted Wife asking her where she was. Wife did not reply.

After Defendant returned home with his daughter, he looked at the picture in the Facebook post on his daughter's computer and decided he wanted to find Wife, talk to her, and save their marriage. Before leaving the house, he put a gun in his pocket "because of how big

3

the guy was in the picture." He thought if the man "tried to beat [him] up or something, that [he] would be able to back him off with it." Wife had previously "been with [men] that were of the same build[,]" and once told Defendant "that these guys could crush [him]." Defendant drove to the theater, parked in front, and waited for Wife to exit the theater. He "just wanted to talk to [Wife] and help her to see that what she was doing wasn't right and to come back home . . . that God is going to punish her for what she's done . . . [and he] wanted to save her from that."

When Wife exited the front entrance of the theater alongside Moore, Defendant exited his vehicle and approached Wife near the theater entrance, asking her, "[W]hat's going on." Wife responded that she was on a date. When Defendant told her that they had not talked about dating, Wife told him, "I don't need your permission." Defendant pleaded with her, telling Wife he just wanted to talk and asked why they couldn't work things out.

At that time, Moore told Defendant, "[S]he moved out, pal[,]" and Defendant told Moore, "this doesn't have to do with you." Moore responded, "it f-ing does because we're on a date." Wife intervened, putting her hand to Moore's chest "like she was holding him back from [Defendant]." As Defendant continued talking to Wife, Moore kept interfering with their conversation. Defendant backed up "countless times" as Moore "kept saying over and over, again, who the fuck are you and every time he would step toward me and I would back up." Defendant was 5'10" and estimated that Moore was 6'4" or 6'5" and "really big." Defendant had backed up until he was close to tripping over a "sidewalk median." He stopped there, while Wife and Moore "started like circling around [him] to [his] right." As Moore went around Defendant, Moore told him, "I'm not from here, mother fucker, I will have your throat slit within two hours." At that time, Defendant turned his focus completely on Moore because Defendant,

4

"didn't know when [Moore] was going to cut my throat" as "within two hours that's any time there." Defendant testified that at that point,

> I got this really sick feeling in my stomach. I felt like I was kind of like [spinning]. And it was like the sky was getting darker. Everything is – it's like everything was getting farther, . . . farther away. And sounds were sounding like they were farther and farther away. And everything was like closing in on me. And by the time he said, you don't know who the fuck you're messing with[,] my vision was just about gone . . . . like I was [blacking] out or something . . . [Moore] was like getting blurry.

Moore had stepped up onto the median, while Defendant remained on the asphalt. Defendant then asked, "[W]hy are you threatening me[,]" to which Moore stated, "I don't play these redneck games." Defendant testified, "I did see some kind of motion right before the shots were fired. . . . I know there was some kind of motion that he made." Moore had taken "what [Defendant] would call a fighting stance[,] . . . sideways looking at [Defendant]" with his right shoulder closer to Defendant, and Defendant "saw his right arm move." Defendant sensed that he was then in danger, "perceived that [Moore] was trying to grab [him,]" backed up, and at the same time pulled his gun out. Moore told Defendant, "[Y]ou don't know who the fuck you are messing with." At that point, Defendant fired his gun multiple times.

Defendant could not remember much of what occurred after he shot Moore except that he was sitting in his car with his hands on the steering wheel, trying to recall what had happened. When he got out of his car, someone was approaching, and he told them to call 911, saying, "I think I just shot someone." Moore died of his wounds, and Defendant was arrested and charged with first-degree murder and armed criminal action.

During the instruction conference, defense counsel submitted what the trial court designated as Instruction A,[4] "an instruction pursuant to 306.06(a) justification, use of force and

---

[4] The full text of that instruction is set forth in footnote 3 of the majority opinion.

5

self-defense[,]" with counsel arguing, "It's our belief that there was in fact substantial evidence presented at trial from the defendant himself that would justify the giving of this instruction. And, therefore, it should have been granted."[5] The State argued, in essence, that there was no evidence to support that Defendant had "any reasonable belief that he was defending himself from imminent serious [physical injury] or death." The trial court refused to submit Defendant's proposed instruction to the jury.

"A self-defense instruction must be submitted 'when substantial evidence is adduced to support it[.]'" *State v. Avery*, 120 S.W.3d 196, 200 (Mo. banc 2003) (quoting *Westfall*, 75 S.W.3d at 281). Failure to do so is reversible error. *Id.* "'Substantial evidence' is evidence putting a matter in issue."[6] *Id.* (citing *State v. Weems*, 840 S.W.2d 222, 226 (Mo. banc 1992)).

Self-defense is codified in section 563.031, which provides in relevant part:

1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself . . . from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person, unless:

    (1) The actor was the initial aggressor…

. . .

2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:

---

[5] Although Instruction A states that it pertains only to Count I (murder), the jury found Defendant guilty of armed criminal action pursuant to Instruction 10, which states that Defendant is only to be found guilty if Defendant "committed the offense of murder in the first degree." Therefore, if Instruction A invalidates Defendant's conviction for murder, it necessarily invalidates his conviction for armed criminal action as well.

[6] Self-defense is a special negative defense such that once the defendant meets the burden to inject the issue, the State bears the burden to prove beyond a reasonable doubt that the killing was not justified. *State v. Howard*, 896 S.W.2d 471, 482 (Mo.App. 1995); section 556.051. *Avery's* definition of "substantial evidence" appears to be consistent with the requirements in section 563.031.5 that "defendant shall have the burden of injecting the issue of justification" and in section 556.051(1) that the issue not be "submitted to the trier of fact unless supported by evidence[,]" without shifting to the defendant the burden of proving that defense.

(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself . . . against death, serious physical injury, or any forcible felony. . . .

. . .

5. The defendant shall have the burden of injecting the issue of justification under this section. . . .

Section 563.031, RSMo Cum.Supp. 2013.

In accord with the self-defense elements in section 563.031, Defendant's proposed Instruction A[7] would have instructed the jury that "a person is not permitted to use deadly force unless he reasonably believes[8] that the use of deadly force is necessary to protect himself against death or serious physical injury." The proposed instruction would have then instructed the jury with the following "case-specific statement of law[:]"

> On the issue of self-defense as to Count I you are instructed as follows: First, if the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force by Derek Moore, and
> Second, the defendant reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury from the acts of Derek Moore, then his use of deadly force is justifiable and he acted in lawful self-defense.

In order to find Defendant not guilty by reason of self-defense based on this case-specific instruction, therefore, the jury would have had to find: (1) Defendant had a reasonable belief that deadly force was necessary to protect himself (2) from the imminent use of unlawful force by

---

[7] At oral argument, both Defendant and the State agreed that there was no issue at trial as to the form of the instruction and the only reason the instruction was denied was the trial court's belief that it was not warranted by the evidence. The State does not now make any attempt to contest the contents of the proposed instruction.

[8] "[R]easonably believe" is defined within the instruction as:

> a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

The majority's determination that Defendant's beliefs and actions were not reasonable usurps the role of the jury. "All decisions as to what evidence the jury must believe and what inferences the jury must draw are left to the jury, not to judges deciding what *reasonable* jurors must and must not do." *Jackson*, 433 S.W.3d at 399 (emphasis added).

7

Moore (3) that Defendant reasonably believed would have resulted in his death or serious physical injury. The following evidence put each of those elements at issue:

First, deadly force is statutorily acceptable if Defendant reasonably believed it necessary to protect himself against death or serious physical injury. Section 563.031.2. The jury could have found that Defendant had a reasonable belief that deadly force was necessary based on his testimony that Moore, a much larger man, backed Defendant up until he was close to tripping over a sidewalk median, circled around him, told Defendant that he would "have [Defendant's] throat slit within two hours[,]"[9] assumed a "fighting stance[,]" and then moved his right arm toward Defendant. In this context, the jury could have found that Defendant reasonably believed that Moore was about to slit his throat and Defendant needed to use deadly force to prevent that.

Second, the jury could have found that Defendant had a reasonable belief that Moore intended the imminent use of unlawful force based on Defendant's testimony that Wife put her hand on Moore's chest "like she was holding him back from [Defendant]" from which the jury could infer that she was actually holding him back, from Defendant's testimony that Moore had threatened to have Defendant's throat slit within two hours and then assumed a fighting stance, and from the inference that Moore's movement of his arm toward Defendant from this fighting stance was consistent with Moore's threat to have Defendant's throat slit within that threatened time frame.

---

[9] Although "words alone are insufficient" to support Defendant's claim of self-defense, Moore's threats are by no means irrelevant. *State v. Avery*, 120 S.W.3d 196, 206 (Mo. banc 2003). MAI-CR 306.06A and the proposed instruction which, again, the State concedes it had no quarrel with as to form, stated that the threats could be considered by the jury in determining "who was the initial aggressor in the encounter" and "whether the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the imminent use of unlawful force by Derek Moore." Moore's threats, though not enough alone to acquit by self-defense, were sufficient to put certain elements at issue and could be considered by the jury, in conjunction with other circumstances, to support Defendant's reasonable beliefs as to each self-defense element.

Third and finally, the jury could have concluded that Defendant reasonably believed that death or serious physical injury would have resulted if Moore had been able to make good on his threat to slit Defendant's throat. "'**Serious physical injury'** means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body[.]" Section 556.061. Although no weapon was found on Moore's person, the jury could have concluded that Defendant believed that Moore had a knife (or some other instrument capable of slitting Defendant's throat) based on his testimony that Moore had threatened to slit his throat, assumed a fighting stance, and moved his arm toward Defendant.[10] The jury also could have concluded that Defendant believed that having his throat slit would expose Defendant to the risk of death and Defendant was entitled to proportionally respond to the threat of deadly force with deadly force. Therefore, there was evidence putting at issue all three of the applicable section 563.031 elements of self-defense, as mirrored in Defendant's proposed Instruction A, and that instruction should have been submitted to the jury.

In addition to section 563.031 and MAI-CR 306.06A requirements, however, our existing case law adds common law factors of self-defense that must be met before a self-defense instruction is warranted.

> According to the case law interpreting this statute, to support a self-defense instruction, the evidence must show: (1) an absence of aggression or provocation on the part of the defender; (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death; (3) a reasonable cause for the defendant's belief in such necessity; and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life.

---

[10] The trier of fact can conclude that a knife constitutes the use of deadly force but does not have to as a matter of law. *Westfall*, 75 S.W.3d at 283.

9

*State v. Thomas*, 161 S.W.3d 377, 379 (Mo. banc 2005) (citing *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984)).[11]

"Whether the evidence raises the issue of self-defense is a question of law." *State v. Nunn*, 697 S.W.2d 244, 246 (Mo.App. 1985). Once the issue is raised, however, the viability of the defense is for the jury. For example, it is for the jury to determine whether there was a real or apparently real necessity for Defendant to kill in order to save himself from an immediate danger and whether Defendant's belief in the necessity of using deadly force was reasonable. *Weems*, 840 S.W.2d at 227; *Chambers*, 671 S.W.2d at 783. The physical differences between Defendant and Moore are also for the jury to consider. *Weems*, 840 S.W.2d at 227. The reasonableness of pursuing another course of conduct such that Defendant can be said to have done all in his power consistent with his personal safety to avoid the danger and the taking of human life is also within the sound discretion of the jury. *Id.*; *Chambers*, 671 S.W.2d at 783-84.

Viewing the evidence in the light most favorable to giving the requested self-defense instruction, as we must, substantial evidence—evidence putting these matters in issue—supports

---

[11] Although I am bound to follow our supreme court's determination that evidence must put all four of these factors at issue before a self-defense instruction is warranted, footnote 2 *supra*, I am concerned by the seeming disconnect between the section 563.031 self-defense elements and this four-factor test. For example, I find no basis in the statute or the model instruction that would require evidence of "an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life." *Thomas*, 161 S.W.3d at 379. My review of the case law supporting the application of the four-factor test in the context of whether evidence put self-defense at issue reveals that, as relied upon in *Thomas*, *Chambers* does not mention section 563.031 or purport to explicitly interpret section 563.031 in applying the four-factor test, but rather merely recites it from earlier cases. *Chambers*, 671 S.W.2d at 783 (citing *State v. Wilson*, 645 S.W.2d 372 (Mo.1983), *State v. Rash*, 221 S.W.2d 124 (Mo. 1949), and *State v. Hicks*, 438 S.W.2d 215 (Mo.1969)). *Wilson*, *Rash* and *Hicks* all addressed the issue of whether the defendant was entitled to a directed verdict of acquittal because the evidence was insufficient, as a matter of law, to show they did not act in self-defense. *Wilson*, 645 S.W.2d at 373; *Rash*, 221 S.W.2d at 216-17; *Hicks*, 438 S.W.2d at 218. None of these cases addressed whether evidence put self-defense at issue. The first complete compilation of the four-factor test that I can locate is found in *State v. Jackson*, 522 S.W.2d 317, 319 (Mo.App. 1975), which was decided four years before section 563.031 first became effective. Once again, *Jackson* addressed the defendant's claim that he was entitled to a judgment of acquittal because the evidence showed he acted in self-defense. *Id.* It did not address whether evidence put self-defense at issue. Given these observations and the complete absence of any case law analysis as to how this four-factor test provides any assistance in reviewing whether the evidence puts the section 563.031 elements of self-defense at issue, I have substantial reservations about the four-factor test's utility and continued applicability.

10

all four ***Thomas/Chambers*** elements. First, there was evidence of "an absence of aggression or provocation on the part of" Defendant in that although Defendant sought out Wife at the movie theater and began talking with her, Moore initiated physical aggression by repeatedly moving toward Defendant, having to be restrained by Wife, threatening to slit Defendant's throat, assuming a fighting stance, and raising his hand toward Defendant in a manner consistent with that threat. ***Chambers***, 671 S.W.2d at 783. Consequently, a jury could infer from these circumstances that Moore was the initial aggressor, *see **id.***, and Defendant was not because he repeatedly backed up every time Moore came toward him.[12]

Second, there was evidence of "a real or apparently real necessity for [Defendant] to kill in order to save himself from an immediate danger of serious bodily injury or death[.]" ***Id.*** Moore told Defendant, "I will have your throat slit within two hours[,]" and Defendant believed him. In the next instant, which was within the threatened two-hour period, Moore assumed a fighting stance and Defendant saw Moore's right arm move toward him. Defendant's belief that Moore intended to slit his throat combined with Moore's arm movement toward Defendant from an aggressive fighting stance consistent with accomplishing Moore's threat to slit Defendant's throat is substantial evidence from which the jury could infer a real or apparently real necessity for Defendant to kill in order to save himself from an immediate danger of serious bodily injury or death.

Third, there was evidence of "a reasonable cause for [Defendant's] belief in such necessity[.]" ***Id.*** In addition to Moore's conduct described above, Defendant testified that Moore was much larger than him. Defendant was 5'10" and estimated that Moore was 6'4" or

---

[12] Indeed, this factor is not at issue in this appeal. The State concedes that Instruction A was in proper form, footnote 8 *supra*, and Part B of that instruction omits the defendant as the initial aggressor element and language as provided in MAI-CR 306.06A, when "there is no evidence that the defendant was the initial aggressor[.]"

11

6'5" and "really big." This size differential was exaggerated by Moore stepping up on the median and towering even higher over Defendant standing on the asphalt. Defendant was not required to submit to a public assault because he was physically inferior; the use of a weapon could have been found to be reasonable on this basis. *Id.* Whether shooting Moore was a *reasonable* action given Moore's size and conduct was for the jury to determine.

Finally, there was evidence of "an attempt by [Defendant] to do all within his power consistent with his personal safety to avoid the danger and the need to take a life."[13] *Id.* Defendant testified that he backed up "countless times" as Moore continued to come toward him until Defendant was close to tripping over a "sidewalk median." Defendant's testimony supports that he attempted to take *some* action to avoid taking Moore's life. Whether it was "*all* within his power" (emphasis added) was for the jury to decide.

The State argues that "[t]his was not substantial evidence that [Moore] put Defendant in an immediate danger of serious bodily injury or death, nor was it substantial evidence that Defendant's belief that he needed to kill [Moore] to save himself was reasonable" based on *State v. Smith*, 456 S.W.3d 849, 852 (Mo. banc 2015). In *Smith*, our supreme court in one paragraph stated the evidence in the light most favorable to giving a self-defense instruction and held:

> The record in this case does not establish that Smith reasonably believed the use of deadly force was necessary. Rather, the record reveals that Williams threatened to fight, yelled at, and came within inches of Smith. Williams neither hit nor exhibited a weapon to Smith. No one, including Smith, saw a weapon on Williams during the incident. Smith testified that not until Williams had run away and stopped between two dumpsters did he "figure" that Williams was looking for a gun. Accordingly, Smith was not faced with a real or apparently real necessity to use deadly force to defend himself against Williams when he fired the first

---

[13] *Jackson*, 522 S.W.2d at 319, cites *State v. Sherrill*, 496 S.W.2d 321, 325 (Mo.App. 1973) as the origin of this fourth factor. *Sherrill* states that "[s]elf-defense is a last resort and in order to justify a homicide on such grounds the doer of the homicidal act must have done everything in his power, consistent with his own safety, to avoid the danger and avert the necessity, and he must retreat, if retreat be practicable." *Sherrill*, 496 S.W.2d at 325-26. Based on *Sherrill*, it seems the fourth factor is premised on a duty to retreat that may no longer exist in Missouri under section 563.031 after its effective date. *See State v. Jordan*, 646 S.W.2d 747, 751-52 (Mo. banc 1983); *State v. Morley*, 748 S.W.2d 66, 68-69 (Mo.App. 1988).

12

gunshot before Williams ran away.  Accordingly, the circuit court did not err in its refusal to submit a self-defense instruction.

*Id.*

Unlike in *Smith*, where there was no evidence of the potential use of a deadly weapon at the time of the defendant's first shot, there is evidence here that just immediately before Defendant's first shot, Moore had repeatedly kept moving toward Defendant, threatened to have Defendant's throat slit, assumed a fighting stance, and raised his hand toward Defendant in a manner consistent with that threat.  Based upon these factual differences in the evidence, *Smith* is distinguishable.

Were *Smith* not so distinguishable, it would be necessary to consider whether the section 556.051(1) definition of "*supported by evidence*" for injecting the issue of self-defense is essentially the same as "*a basis in the evidence* to acquit the defendant," in section 556.046.3 (emphasis added), and "*a basis for a verdict* acquitting the defendant," in section 556.046.2 (emphasis added), for giving a lesser-included offense instruction, as considered and addressed in *Jackson*, 433 S.W.3d at 395-396 and 402.  If so, then, in accordance with the dictates of *Jackson*, it appears that the *Smith* court and the majority here may have become overpowered by the strong evidence and obvious inferences *against* giving a self-defense instruction, *see Jackson*, 433 S.W.3d at 400 (giving instruction in the face of such evidence and inferences "seems almost to beg of jury nullification"), ignored the principle that "no evidence **ever** proves an element of a criminal case until all 12 jurors believe it, and no inference **ever** is drawn in a criminal case until all 12 jurors draw it[,]" *id.*, and yielded to the temptation to decide "what a 'reasonable juror' in a criminal case must or must not find[,]" *id.*

The favorable evidence here, however, more closely resembles that in *Avery*.  There, the favorable evidence came from a statement given by Avery that "when [decedent] returned to her

13

home on the evening of the shooting, she pointed the revolver at him and told him to leave, that [decedent] said to Ms. Avery that she should drop the revolver or he would 'kick her a--,' and that when Ms. Avery refused, [decedent] 'made a movement towards her. She backed away, and fired one shot.'" *Avery*, 120 S.W.3d at 203. Our supreme court held that this evidence put self-defense at issue. *Id.*

Defendant's account of the events here, however improbable when considered in light of the contrary evidence presented by the State, *see Weems*, 840 S.W.2d at 227, was nevertheless evidence that put each of the section 563.031 self-defense elements at issue, as set out in Defendant's proffered self-defense Instruction A, and that put the four *Thomas*/*Chambers* factors at issue. By definition, therefore, substantial evidence supported Defendant's self-defense theory. I would hold that the failure to instruct the jury on self-defense was error.

> Failure to provide the required instruction, or give it in accordance with an accompanying Note on Use, may have adversely influenced the jury and is reversible error. Such errors are presumed to prejudice the defendant unless it is clearly established by the State that the error did not result in prejudice.

*Westfall*, 75 S.W.3d at 284 (internal quotation marks and footnotes omitted). In its respondent's brief, the State does not use the word "prejudice," much less make any argument that Defendant was not prejudiced by the erroneous rejection of Instruction A. Confronted with this omission, I cannot become an advocate for the State and craft such an argument for it or conclude that the State has clearly established that the trial court's refusal of Instruction A did not result in prejudice to the Defendant.

I would grant Defendant's point, reverse his convictions, and remand the case for a new trial.

GARY W. LYNCH, J., dissenting opinion author

14